# Table of Contents

I.     INTRODUCTION .................................................................................................................. 2

II.    FACTUAL BACKGROUND .............................................................................................. 3

III.   STANDARD OF REVIEW ................................................................................................ 12

    A.   **Motion to Dismiss** ...................................................................................................... 12

    B.   **Motion for Summary Judgment** .............................................................................. 13

    C.   **Judicial Deference to Prison Authorities** .............................................................. 15

IV.    ARGUMENT .................................................................................................................... 15

    A.   **Governmental Immunity Precludes Defendants' Liability** ................................. 15

    B.   **The Court Must Dismiss Claims Against Defendants Bailey, Harvey, Taylor, Donaway, and Wilson, Due to Lack of Alleged Facts Needed to Support Claims Against Them.** ................................... 16

    C.   **Plaintiff Failed to Exhaust His Available Administrative Remedies about access to jobs, out-of-cell education, visitation, religious services, or law library access at any time, or for his present claims about other conditions on HU5.** ......................... 17

    D.   **Plaintiff's Conditions of Segregation Confinement Did Not Violate His Fourteenth Amendment Due Process Rights.** ................................... 20

    E.   **Plaintiff's Conditions of Segregation Confinement Did Not Violate His Eighth Amendment Rights.** ................................... 27

    F.   **Plaintiff Has No Cause of Action for Any Limitations on Jobs and Programs** ................................ 30

    G.   **Plaintiff Fails to State a Claim for Denial of Access to the Courts.** ................................... 30

    H.   **Plaintiff Failed to State a Claim for Interference with His Religion.** ................................... 31

    I.   **Visitation** ................................................................................................................... 34

    J.   **There is No *Respondeat Superior* Liability in this Case.** ................................... 35

    L.   **Qualified Immunity Precludes Liability** ............................................................... 35

    L.   **The Court Should Deny Plaintiff's Request for Injunctive Relief.** ................................... 37

V.     **CONCLUSION** ................................................................................................................ 38

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SAMUEL SMALLS, #501-033 | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO.: PX-23-723 |
| WILLIAM BAILEY, WARDEN, *et al.* | * | |
| Defendants. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS, OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff filed suit complaining first about conditions of confinement in the Eastern Correctional Institution (ECI) restrictive disciplinary segregation unit, HU4. There, restrictions were in place to better protect the population and staff by exercising needed control over inmates who demonstrated especially disruptive behaviors. Plaintiff was assigned there after he violated inmate rules on August 18, 2022. He complains about the conditions even though, from his long experience with such infractions, he knew on August 18, 2022, that if he chose to violate the rules, as he did, he chose to subject himself to those restrictions.

Plaintiff complains more so about his placement on administrative segregation (AdSeg) in ECI's housing unit 5. He was placed there after demonstrating consistent disruptions and to better position him for a transfer to another institution, a goal he wanted to pursue. Plaintiff agreed with the placement. The AdSeg population was subject to restrictions also as needed to contain and protect this special population. Although Plaintiff could have asked at any time for approval to be removed from AdSeg pending transfer status and sent back to general population (a request the institution could have granted), he never once asked. Instead, he waited until 6 months after his placement to file this lawsuit, and, even here, does not

ask to be removed from AdSeg.

In any event, the conditions about which Plaintiff complains did not violate his rights under the Eighth Amendment, the Fourteenth Amendment, or otherwise. The Court should dismiss Plaintiff's complaint or enter summary judgment in Defendants' favor.

## II.    FACTUAL BACKGROUND

On July 21, 2021, Plaintiff arrived at ECI and received a copy of the ECI Inmate Handbook (Handbook). **ECI Ex. 1** pp. 4, 5-33. The Handbook reminds inmates that they are subject to disciplinary action for violating inmate rules. **ECI Ex. 1** pp. 8, 18-23.  Plaintiff arrived to ECI with experience in this regard, having a history of disciplinary segregation (DisSeg) assignments because of his inmate rule violations. **ECI Ex. 1** p. 35-37.

On August 18, 2022, less than a month of his arrival, Plaintiff violated inmate rules, was served with an infraction (NOIRV), and assigned to ECI's disciplinary Housing Unit (HU) 4 on Administrative Segregation pending adjustment (AdSeg PA). *See* **IHO Ex. 2** pp. 2, 3; **ECI Ex. 1** p. 4.  At that time, he received a copy of the Housing Unit Four Segregation Unit Inmate Orientation Manual Procedures/Rules and Information (Seg Manual). **ECI Ex. 1** pp. 38-61.

On August 29, 2022, the Inmate Hearing Office (IHO) held the hearing on Plaintiff's August 18, 2022, charges. **IHO Ex. 2** p. 5-7; **DeVaughn Ex. 3** ¶ 6. On August 31, 2023, the IHO uploaded its ruling on the Adjustment Record, visible to Case Managers. **DeVaughn Ex. 3** ¶¶ 4, 6. At that point, Plaintiff would have been eligible to be assigned to general population if beds for his security level were available; however, there were no available beds. **Kestler Ex. 4** ¶¶ 6, 13.

Before and after Plaintiff's hearing, he said he wanted to transfer out of ECI. **Kestler Ex. 4** ¶ 6  After Plaintiff's hearing, he expressed frustration about being in HU4 and not having access to personal property he could have had on general population. **Kestler Ex. 4** ¶ 6. Lt. Kestler, speaking with Plaintiff about his concerns, suggested that, although there were no available general population beds, they could

3

recommend moving him to AdSeg pending transfer so he could leave HU4, have his property, and likely be able to transfer sooner than if he asked for a lateral transfer.[1] **Kestler Ex. 4 ¶¶** 8, 9; *see also* **DeVaughn Ex. 3 ¶¶** 13, 14. Given Plaintiff's escalating difficulties in following inmate rules, it was believed placing Plaintiff on AdSeg pending transfer would help meet his goals and possibly get him into an institutional facility in which he could do better, while reducing the threat his escalating disruptions otherwise presented to safety, security, and the good order of the institution. **Kestler Ex. 4 ¶** 14, 15, 16; **DeVaughn Ex. 3 ¶¶** 11-14; **McCabe Ex. 5 ¶** 8. The move was his best option. *Id*. Plaintiff did not object to the placement idea, and confirmed he wanted a transfer. **Kestler Ex. 4 ¶** 14.

- Segregation Review Team Actions

HU4 Team

The day the IHO uploaded its decision to the Adjustment Record, the Special Segregation Committee held a meeting that addressed Plaintiff's situation. **DeVaughn Ex. 3 ¶¶** 6, 7 & pp. 5-7. Seventeen 17 people attended, including a psychologist, intelligence officers, Plaintiff's HU4 case manager DeVaughn, other case managers, and other high ranking correctional officers, including Captain Roslak. *Id*. ¶ 7 & p. 5. At that meeting, Captain Roslak brought up Plaintiff's situation, noted Plaintiff's past behavioral issues had escalated to an infraction, and asked if he could be transferred. *Id*. ¶ 8 & p. 6. As beds were not available to return him to general population at that point, it was decided Plaintiff would stay on HU4, pending consideration during the next scheduled "Off Segregation" meeting. *Id*. ¶ 8. During the next weekly "Off Segregation" meeting, on September 7, 2022, it was noted that, per Captain Roslak, Plaintiff should be placed on the transfer list, largely because of safety and

---

[1] Under DPSCS policy, an inmate may request a lateral transfer to another institution if he has been housed at his then-current institution for a minimum of two years, has not received a guilty finding for an institutional rule violation for at least two years, and has been removed from disciplinary segregation for at least two years. DOC.100.0002 § 6.A(1).

security concerns Plaintiff presented by his difficulties with following safety and security rules. *Id*. ¶ 9.

In further conference, on September 8, 2022, Captain Roslak, Plaintiff's Case Manager DeVaughn, and Lt. Kestler agreed to recommend that, to expedite Plaintiff's transfer and mitigate any risk of further safety and security risk his escalating disruptions implicated, Plaintiff should be placed on AdSeg pending transfer. **DeVaughn Ex. 3 ¶¶ 10, 11; Kestler Ex. 4 ¶ 15; McCabe Ex. 5 ¶ 7.** So, on September 8, 2023, Lt. Kestler served Plaintiff with Notice of Assignment to Administrative Segregation pending transfer, and Plaintiff moved to HU5 pending further evaluation of the recommendation. **DeVaughn Ex. 3 ¶¶ 10, 11; Kestler Ex. 4 ¶¶ 15, 17 & p. 5.**

Assignment to AdSeg pending transfer in such situations is not unusual or atypical, and is consistent with placement protocol per DOC.100.0002 § 17.B. **Kestler Ex. 4 ¶ 16; McCabe Ex. 5 ¶¶ 7, 8.** For example, an inmate may be placed on segregation when "his continued misbehavior demonstrates an inability to conform to the rules and regulations of the institution, the Division, or both." DOC.100.0002 § 17.B(2)(g); **ECI Ex. 1 ¶5.** Plaintiff had problems functioning within DPSCS and ECI rules, which was disruptive to other inmates and put him at risk of conflict if out in the general population. **DeVaughn Ex. 3 ¶ 11;** see also, **Kestler Ex. 4 ¶ 14; Donoway Ex. 6 ¶ 9.**

<u>HU5 Team</u>

Per standard procedure, when Plaintiff arrived to HU5 with the AdSeg pending transfer recommendation, Plaintiff's HU5 Case Manager McCabe and other members of the AdSeg team reviewed his paperwork and discussed his case. **McCabe Ex. 5 ¶ 10.** On September 15, 2022, the AdSeg review team, including Case Manager McCabe, an Intelligence Officer Sergeant, another Intelligence Officer, ECI's Chief of Psychology, and another Case Manager, discussed with Plaintiff his AdSeg pending transfer assignment, including the transfer process, explaining a transfer could happen in a week or in twelve months, and that they did not have control over the timing. *Id*. ¶ 10 & p. 6. Plaintiff said he

had no concerns or issues and agreed to the transfer and to being placed on AdSeg pending transfer. *Id*. ¶ 10. The Committee's recommendation was approved on September 19, 2022. *Id*. ¶ 11 & p. 7.

After the September 19, 2022, approval, the Seg Review Committee met monthly on the following dates and, each time, agreed Plaintiff should remain on AdSeg pending transfer, noting his approval and placement on the medium security inmate transfer list:  In 2022, October 13, November 20, December 8; in 2023, January 3 and 31, February 28, March 28, April 25, and May 23. **McCabe Ex. 5** ¶ 14. Plaintiff was notified after each meeting. *Id*. If he wanted out of HU 5, he could have contacted case managers, supervisory correctional staff on HU5, and the Warden, to request removal to general population. *Id*. ¶¶ 12-14. He did not do so. *Id*. ¶¶ 12, 15; **Bailey Ex. 7**; **Donoway Ex. 6** ¶ 11; **Wilson Ex. 8** ¶ 6; **DeVaughn Ex. 3** ¶16. Nor did he file an administrative remedy complaint (ARP) asking for removal from AdSeg, *see* **ARC Ex. 9** pp. 2-154.

After the September 19, 2022, approval, on a weekly basis, ECI Case Management supervision sent Headquarters Plaintiff's name and updated information on the transfer wait list to so he could be transferred when a suitable bed became available. **McCabe Ex. 5** ¶ 16. The fact that Plaintiff had enemies at other medium security facilities decreased the opportunities to move him. *Id*. ¶ 17 & p. 8.  Because of persistent difficulties finding space to transfer Plaintiff, in February 2023, McCabe called the Western Correctional Institution (WCI) to see if Plaintiff's enemy there would retract the enemy report, which would open WCI up as an option for Plaintiff's transfer. *Id*. ¶ 18.  As a result of her efforts on Plaintiff's behalf, Plaintiff's WCI enemy retracted the enemy report and, in fact, opened WCI up as a possible place to transfer Plaintiff if a bed became available. *Id*. ¶ 18 & p. 8.

When nine months passed without finding a general population bed for Plaintiff's transfer, on June 21, 2023, the Committee decided to assign Plaintiff to general population while he stayed on the transfer list. **McCabe Ex. 5** ¶ 19. On August 4, 2023, Plaintiff transferred to the Roxbury Correctional Institution

(RCI) at least one year earlier than  if he had requested a lateral transfer. **DeVaughn Ex. 3 ¶¶** 13, 14;

**Kestler Ex. 4  ¶¶** 8, 9; **McCabe Ex. 5 ¶¶** 3, 4, 15; **Donoway Ex. 6 ¶** 13;  **ECI Ex. 1** p. 4.

- Because of the particular risks and needs presented by segregation inmates, DPSCS policy restricts activity in segregation for the protection of the inmates housed there, and staff.

Because of safety and security concerns, DPSCS policy and regulations required the segregation of

inmates who presented a security threat, who were under investigation for certain risk factors, and who

had a particular need for protection; to protect the individual in these segregated housing units, further

restrictions were required to protect them from each other and to contain any risks to staff. **ECI Ex.  1**

**¶¶** 4, 5; *see also,* **Donoway Ex. 6 ¶¶** 7, 8; **Wilson Ex. 8 ¶** 4. As such, group activities such as education

classes and congregate religious service (for both of which segregation inmates had alternatives) were

not available. **Kestler Ex. 4  ¶** 4; **Donoway Ex. 6 ¶** 8.

DPSCS policy governing the activities about which Plaintiff complains, ECF 1 p. 9, provides no

guarantees of their allowances or frequency on segregation, either proscribing them entirely or subjecting

them to prevailing safety and security considerations, as follows.

Recreation

OPS.145.0001 (formerly, DCD 145-1), covers recreation for segregation inmates. It does not set a

minimum recreation time or frequency for them, noting that segregation inmates should be provided the

opportunity to participate in activities *consistent with requirements specific to status and the security*

*regulations related to the special confinement housing.* OPS.145.0001.04.B(4)(b).

Security regulation DOC.110.0006 provides conditions of confinement for DisSeg, DOC.110.0006

§ G, and AdSeg, DOC.110.0006 § A.2. It provides that each warden shall implement an institutional

directive for regular opportunity for out of cell activity at least 5 days per week for an hour (absent

agreement to a lesser time) "*where practicable*" and shall not be available during institutional exigencies

or if inmate misconduct precludes it. DOC.110.0006.H. The relevant institutional directive is

7

ECI.110.0006.03.A(14), which provides for out of cell exercise one hour per day, five days per week "*unless security or safety considerations dictate otherwise*." (emphasis added).

Similarly, the Seg Manual notified Plaintiff that special confinement housing allowed an "opportunity" for supervised out of cell activity periods, *normally* three days a week "*subject to change depending on staffing needs of the Housing Unit*." **ECI Ex. 1** p. 51.  [Seg manual §W]  It does not set a minimum time or frequency, as opportunities are subject to safety and security considerations per OPS.145.0001.04.b(4)(B).

 As for the ACA Standards for Adult Correctional Facilities" that Plaintiff cited, ECF 1 p. 7,  these are guidelines, or, as they self-refer, "expectations." The correct title is, "American Correctional Association's Performance-Based Standards and Expected Practices for Adult Correctional Institutions" Fifth Edition (March 2020) ("ACA Standards"). By its own terms, its provisions are "expected practices," guidelines. See ACA Standards, Forward, p. xvii. The ACA's allowances for recreation, like DPSCS policy, note the preferred (not mandated) recreation is available only "*unless security or safety considerations dictate otherwise*." 5-ACI-4A-24 (emphasis added).

Religion: DOC.110.0006.O and ECI.110.0006.05.P (1) - (3) provide that, while segregation inmates may worship in their cells and have access to a chaplain, congregate religious services will not be provided. The Handbook also informs inmate expectation, instructing that they "are permitted to practice the approved religion of [their] choice *as long as institutional security is not affected*."  **ECI Ex. 1** p. 12 (Inmate Handbook § II.R, (emphasis added)).

Law library: DOC.110.0006.M, subject to institutional directives, permits inmates to have access to legal reference materials in accordance with Division policy and institutional procedures. Institutional procedures provide segregation inmates may have library materials brought to their cells by request on a regular basis. **ECI Ex. 1** p. 46 (Seg Manual § N). *Id*. p. 15 (Handbook §III.J). Plaintiff used this service.

**ECI Ex. 1** pp. 62-63.

Visitation: DOC.110.0006.N allows no more than one visit per week, in a non-contact visiting area, and subject to further restrictions based on conduct. It does not set a minimum frequency. ECI.110.0006.03.A (11) permits such visitation unless there are substantial reasons for withholding such privileges. Although not policy, ACA standards allow visitation *unless there are substantial reasons to withhold it*. 5-ACI-4-A-21.

Education: DOC.110.0006.K gives inmates access to extension education services as provided by the Maryland State Department of Education, along with special education services to eligible inmates. ECI.110.0006.05.AA provides education visits available on request. ECI.110.0006.03.M(3) permits in-cell self-learning lessons. Special education classes may be provided, subject to safety and security, including the use of restraints. ECI.110.0006.03.M(2) & E(4). Plaintiff does not allege he was eligible for such classes.

Jobs: DOC.110.0006, ECI.110.0006, and OPS.145.0001 contain no provision permitting segregation inmates to hold jobs.

Housing Unit 4 and 5 segregation inmates could exercise in their cells, doing calisthenics and other forms of exercise. **ECI Ex. 1** ¶ 8;  **Kestler Ex. 4** ¶ 5; **Donoway Ex. 6** ¶ 5; **Wilson Ex. 8** ¶ 5. In addition to having legal research materials delivered to their cells on request, **ECI Ex. 1** ¶ 8 & p. 46 (Seg Manual § N); *id.* p. 15 (Handbook §III.J); **Kestler Ex. 4** ¶ 5; **Donoway Ex. 6** ¶ 5, AdSeg and AdSeg PA inmates could also use their tablets to conduct legal research. **Donoway Ex. 6** ¶ 5; **ECI Ex. 1** ¶ 10. Plaintiff had a tablet from July 22, 2022, until he left ECI. **ECI Ex. 1** ¶ 10.

*Security considerations particular to HU4 and HU5 during Plaintiff's assignments there*

In segregation, to protect the special confinement inmates (and staff) only small groups of inmates may be moved for dayroom recreation at a time, which meant multiple groups needed to be processed throughout a day. HU4 housed inmates whose display of assaultive or other disruptive conduct warranted

their removal from general population for safety and security reasons, and their protection from each other within the segregation unit. **ECI Ex. 1 ¶ 4**; **Kestler Ex. 4 ¶ 4**. On HU4, inmates from groups of up to 2 cells could be moved at a time to the daytime for their recreation session. **Kestler Ex. 4 ¶ 7**. There could be upward of 258 inmates in the unit. See *Id*. ¶ 7.

The HU 5 population also presented security risks given they were there because there was reason to investigate or conclude they presented an elevated risk to themselves, to others, or to institutional safety and security, or were themselves at risk. **ECI Ex. 1 ¶ 5**; **Donoway Ex. 6 ¶ 4**; **Wilson Ex. 8 ¶ 4**; DOC.100.0002 § 17.B. On HU5, up to 3 cells of compatible inmates could be taken to the dayroom at a time for rec sessions, and if time and staffing allowed, up to 16 cells were provided dayroom recreation in each of the three shifts per day. **Donoway Ex. 6 ¶ 7**.

In each segregation unit, at least one Correctional Officer (CO) was required to move each inmate, and other COs were needed on the tier to provide added protection to the inmates and staff during these movements. **Kestler Ex. 4 ¶ 7**; **Donoway Ex. 6 ¶ 7**. Because of the time required to place handcuffs on inmates at each of their cells, walk them to the dayroom, remove the handcuffs in the dayroom, then replace their handcuffs to retrieve them from the dayroom, walk them back to their cells, and remove the handcuffs back at their cell, recreation movement requires considerable time and staffing for inmate and staff safety. **Kestler Ex. 4 ¶ 7**; **Donoway Ex. 6 ¶ 4**. As a result of staffing issues, at times there were not enough staff to perform these movements for all inmates every day, especially because it was necessary for COs to perform other tier activities necessary for inmate wellbeing, such as providing security for medical visits and medication distributions on the tier, escorting inmates off the tier to medical visits or for transportation to court. **Donoway Ex. 6 ¶ 5**.

During the time that Plaintiff was at ECI, HU4 and HU5 B and C tier dayrooms did not have tables due to the risk of hiding contraband that would jeopardize the safety and security of the segregation

inmates. **ECI Ex. 1 ¶ 7**; **Donoway Ex. 6 ¶ 4.**

> **From September 8, 2022, until his release from AdSeg PA, Plaintiff filed 29 ARPs, and 6 IGO grievances, but the only issues subject to this lawsuit that he took all the way through to the IGO were for HU4 outdoor rec and HU4 indoor rec frequency.**

From September 8, 2022, through June 21, 2023, Plaintiff filed 29 ARPs, **ARC Ex. 9 ¶ 2 & pp. 2-154**, and 6 grievances to the Inmate Grievance Office (IGO), **IGO Ex. 10 ¶ 2 & pp. 3-89.**

With his complaint, Plaintiff presented ARP 1124-22 complaining about HU4's alleged lack of outdoor recreation and the provision of 3 hours of rec per week instead of 5 1-hour indoor recreation activities per week. ECF 1-1; see also **ARC Ex. 9** pp. 22-24. In that ARP, he did not complain about lack of access to jobs, out-of-cell education, religious services, visitation, or law library access. *Id*. His ARP was dismissed because he was receiving out of cell activities, which were subject to change depending on staffing needs of the Housing Unit and according to the Seg Manual. **Ex. 9**. p. 25; ECF 1-1. In his appeal to Headquarters, for the first and only time in the 3 steps of the grievance process for ARP 1124-22, he mentioned HU4 dayroom furnishings. *Id*. p. 28.

With his complaint, Plaintiff presented the IGO decision in case no. 20221311, ECF 1-3, based on his ARP 1214-22 (not 1124-22), complaining not about conditions of confinement, but about being on HU4 after his disciplinary hearing, when he believed he was entitled to go to general population. **IGO Ex. 10** pp. 73-79. ARP 1214-22 did not ask to be removed from HU4. **ARC Ex. 9** pp. 47-48; **IGO Ex. 10** pp. 87-89. In his appeal of the ARP decision to Headquarters, he did complain about conditions of confinement (recreation and other activities) **Ex. 9** pp. 43-46; **Ex. 10** pp. 80-86, but he did not raise those again in his IGO grievance. **IGO Ex. 10** pp. 74-79.

On October 20, 2022, Plaintiff filed grievance 20221234 directly to the IGO to challenge the case management decision to place him on AdSeg pending transfer. **IGO Ex. 10** . He has not challenged that

decision making procedure in this lawsuit.[2]  He claimed, incorrectly, that the decision was arbitrary and capricious, not made by the appropriate personnel constituency, and that his AdSeg status was not subjected to monthly reviews. **IGO Ex. 10** pp. 34-40. Plaintiff did not therein complain about the conditions on HU5. *Id*. pp. 35-39. The IGO dismissed his grievance. *Id* p.33.

In July 2023, he filed two ARPs about recreation, but only within general population on HU6, which is not at issue in this case, and not about HU4, HU5, or AdSeg. *See* **ARC Ex. 9** pp. 142-147 (ARP 991-23), pp. 153-154 (ARP 1046-23).

Plaintiff filed ARP 1703-22 demanding more frequent visitation and, while in general population, HU6, ARP 1033-23 about a job bank **ARC Ex. 9** pp. 66-67, 148-52. He did not appeal these to the IGO level. **IGO Ex. 10**.

Of the balance of the 29 ARPs and 6 IGO grievances he filed during his HU4 assignment and throughout his HU5 assignment, he filed not even one complaint about the conditions of confinement on HU5 subject to this lawsuit, *i.e.*, outdoor recreation, indoor recreation frequency, lack of exercise equipment lack of access to out-of-cell education, religious services, law library access, or dayroom amenities such as furniture. **Ex. 9** ¶ 2 & pp. 2-154; **Ex. 10** ¶ 2 & pp. 3-89. As for HU4, he did not take through the IGO level any complaint about conditions other than HU4 outdoor rec and the frequency of HU4 indoor rec. **Ex. 10**.[3]

### III.    <u>STANDARD OF REVIEW</u>

#### A. <u>Motion to Dismiss</u>

Assessing a Rule 12(b)(6) motion, the court accepts a complaint's well-pled allegations as true and

---

[2] To the extent the Court construes his complaint to raise such an issue, his claim fails for reasons demonstrated herein. *See, e.g*., **McCabe Ex. 5** ¶¶ 10, 11, 14.
[3] Plaintiff filed 1122-22 about HU4 access to personal property, mentioning legal papers he already had in his possession, but not about law library access. **ARC Ex. 9** pp. 13-14; **IGO Ex. 10** pp. 58-72.

construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *Ibarra v. United States*, 120 F.3d 472 (4th Cir. 1997). However, the plaintiff must make allegations that "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court need not accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). The Court should grant a motion to dismiss when the plaintiff failed to plead facts that plausibly suggest he is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

As *Twombly* expounded, and *Iqbal* confirmed, the sufficiency standard for federal pleadings "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A complaint must pass a plausibility test that requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678. Rule 8 "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it." *Twombly,* 550 U.S. at 555 n.3 (quoting 5 Wright & Miller, Federal Practice and Procedure § 1202, at 94-95 (3rd ed. 2004)). "[E]ven a pro se plaintiff has the burden of alleging sufficient facts upon which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996); *Allison v. Utah Cnty. Corp.*, 223 F.R.D. 638, 639 (D. Utah 2004).

**B. Motion for Summary Judgment**

The court may grant a motion for summary judgment if there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A plaintiff who bears the burden of proof must factually support each element of the claim: "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A nonmoving party with the burden of proof must confront the motion for summary judgment with an affidavit or similar evidence, *Anderson,* 477 U.S. at 256, and "designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex Corp.*, 477 U.S. at 324, and must present "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). A "mere scintilla of evidence" does not create a fact issue. *Barwick v. Celotex Corp.,* 736 F.2d 946, 958-59 (4th Cir. 1984).

Although the court ordinarily may not determine credibility between the parties, *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (reversing and stating that Court of Appeals should not have relied on plaintiff's "visible fiction" in resolving summary judgment motion)); *see also*, *Ricci v. DeStefano*, 557 U.S. 557 (2009). The Court also may reject testimony as incredible, as a matter of law, if it contains assertions that are contrary to the laws of nature. *See United States v. Zizzo*, 120 F.3d 1338, 1359 (7th Cir. 1997), *cert. denied*, 522 U.S. 998 (1997); *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1123 (5th Cir. 1997), *cert. denied*, 522 U.S. 819 (1997). "It is well established that a plaintiff's self-serving affidavit is not sufficient to withstand summary judgment." *See, e.g., Nat'l Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000).

**C. Judicial Deference to Prison Authorities**

Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

> In the difficult and dangerous business of running a prison, frontline officials are best positioned to foresee threats to order and to fashion responses to those threats. Hence, the "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination'" *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)). When a state correctional institution is involved, the deference of a federal court is even more appropriate. *Turner*, 482 U.S. at 85.

*In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, (aka, Mickle v. Moore)* 174 F.3d 464, 469 (4th Cir. 1999) (hereafter, *Mickle*). Inmate classification and classification-related housing decisions falls within the expertise of correctional officials. *See, Wetzel v. Edwards,* 635 F.2d 283 (4th Cir. 1980).

Based on these standards, the Court should grant summary judgment in Defendants' favor.

**IV.   ARGUMENT**

**A.  Governmental Immunity Precludes Defendants' Liability**

Under the Eleventh Amendment, unless the state consents, the state, its agencies, and departments, as well as its employees in their official capacity, are immune from federal lawsuits. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-102 (1984); *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985). The State of Maryland waived sovereign immunity for some state court cases, *see* Md. Code Ann., State Gov't § 12-201(a) (2004 Repl. Vol.), but not its Eleventh Amendment immunity to suit in federal court. The Court should dismiss the federal law claims against Defendants in their official capacity.

**B. The Court Must Dismiss Claims Against Defendants Bailey, Harvey, Taylor, Donaway, and Wilson, Due to Lack of Alleged Facts Needed to Support Claims Against Them.**

The Court should dismiss all claims against Defendants Bailey, Harvey, Taylor, Donaway, and Wilson because Plaintiff alleges no particular facts indicating they personally acted to cause the alleged violation. "[W]here the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) *aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000) (quoting *Morabito v. Blum*, 528 F. Supp. 252, 262 (S.D.N.Y. 1981)); *Polk v. Montgomery Cnty., Md.,* 548 F. Supp. 613, 614 (D. Md. 1982) (reversed on other grounds). "[E]ven a pro se plaintiff has the burden of alleging sufficient facts upon which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996); *Allison v. Utah Cnty. Corp.*, 223 F.R.D. 638, 639 (D. Utah 2004). Absent allegations of actual personal participation in the alleged violations, no basis is stated for a defendant's liability. *See Trulock v. Freeh,* 275 F. 3d 391, 402 (4th Cir. 2001).

Plaintiff's only mention of Defendant Taylor is the statement that he generally is responsible for investigations of inmate grievances filed with the IGO. ECF 1 p. 3; ECF 11-1 p. 3. Plaintiff's allegations as to Defendants Bailey and Harvey are similarly limited to their alleged general responsibility for ECI operations. ECF 1 pp. 2,3; ECF 11-1 pp. 2, 3. As for Lieutenant Donoway and Sgt. Wilson, Plaintiff merely alleges they managed HU5. ECF 11-1 p. 3, 4. Plaintiff fails to allege personal involvement.

Plaintiff's best-case-scenario as to Defendant Bailey is an inference from Plaintiff's attached ARP 1124-22, signed by then Assistant Warden Bailey. ECF 1-1 p. 1. However, as this Court already recognized in *Chukwurah v. Corizon Health Care*, No. CV PX-22-212, 2023 WL 4268556, at *6 (D. Md. June 29, 2023), the act of dismissing or processing grievances alone does not support liability for even constitutionally questionable conditions. *See also Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th

Cir. 2009) (citing *Whitington v. Ortiz*, 307 Fed. Appx. 179, 193 (10th Cir. 2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.")). Defendant Bailey's ARP dismissal is not sufficient to impose liability. Warden Bailey did approve the AdSeg pending transfer assignment, but the herein lawsuit complains about the HU5 conditions, not about the procedural aspects leading Plaintiff to HU5; therefore, that approval is not relevant. Moreover, such approval is a function, like the ARP process, which does not amount to actionable personal involvement.

Former Commissioner Harvey's signature does not appear on the ARP appeal Plaintiff submitted. See ECF 1-2 p. 2; **Harvey Ex. 11**. Similarly, it is not Mr. Taylor's signature, but Deputy Director Woolford's, that appears on the IGO document Plaintiff offers. See, ECF 1-3 p. 1.

### C. Plaintiff Failed to Exhaust His Available Administrative Remedies about access to jobs, out-of-cell education, visitation, religious services, or law library access at any time, or for his present claims about other conditions on HU5.

This Court should dispose of Plaintiff's claims in Defendants' favor because Plaintiff failed to exhaust his available administrative remedies with respect to access to jobs, out-of-cell education, religious services, or law library access at any time, *i.e.*, on HU4 or HU5, or for his present claims about the conditions on HU5. *See Jones v. Bock*, 549 U.S. 199, 220 (2007). Plaintiff complained about outdoor rec and the frequency of indoor rec on HU4 through the IGO level based on ARP 1124-22. He did not initiate ARPs on the other conditions about which he complains in this case but mentioned them either in a HQ appeal or at the IGO level, without taking them through all three steps, as in the appeal of 1214-22. These efforts fail to satisfy his requirement to exhaust his available administrative remedies before filing suit, other than as to outdoor rec for HU 4 inmates and the frequency of indoor rec for HU4 inmates.

To sustain a claim, Plaintiff first must exhaust his available administrative remedies, as mandated by State law and Department of Public Safety & Correctional Services (DPSCS) regulations. *See* Md. Ann. Code, Corr. Serv. Art. §10-201 *et seq*. (1999); Md. Cts. & Jud. Proc. Code Ann., §5-1001, *et seq.*

Federal law mandates such exhaustion before a prisoner may file an action under §1983. "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. §1997e(a) (1996). *Anderson v. XYZ Correctional Health Services*, 407 F.3d 674 (4th Cir. 2005).

The inmate must pursue these administrative remedies to the highest available level. *See, Woodford v. Ngo*, 126 S.Ct. 2738 (2006). "An inmate who begins the grievance process but does not complete it is barred from pursuing a §1983 claim…." *Wright v. Hollingworth*, 260 F.3d 357, 358 (5th Cir. 2001); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). Maryland's grievance process generally consists of three levels. *Chase v. Peay*, 286 F. Supp. 2d 523, 529 (D. Md. 2003).

First, the inmate must file an administrative remedy request/complaint (ARP) with the Warden's office within 30 days of the later of the date on which the incident occurred or the date the inmate first gained knowledge of the incident or injury giving rise to the complaint. COMAR 12.02.28.02(D)(1); COMAR 12.02.28.09(B). If the ARP is denied or dismissed, the inmate has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR 12.02.28.11.A, 12.02.28.11.D, and 12.02.28.14(B)(5). If the appeal is denied, the inmate has 30 days to file a grievance with the IGO. Md. Code Ann., Corr. Servs. §§ 10-206, 10-210; COMAR 12.02.28.18.

Plaintiff demonstrated the ability to file ARPs on many topics during his ECI stay, having filed 29 ARPs and 6 IGO grievances throughout his HU4 and HU5 assignments, and otherwise displayed familiarity with ARP requirements. **ARC Ex. 9**. ¶ 2 & pp. 2-154; **IGO Ex. 10** ¶ 2 & pp. 3-89; **Wilson Ex. 8** ¶ 7. Indeed, he showed he was prone to file ARPs about recreation, as he did for every housing unit he was in *except HU5*, signifying he felt he had no reason to do so for conditions in HU5. See **Ex. 9** pp. 22-24 (ARP 1124-22 on HU4), and pp. 142-47, 153-54 (ARPs 991-23 and 1046-23 on HU6).

The only complaint Plaintiff pursued to the IGO on claims raised in this case was from ARP 1124-22, limited to HU4 indoor exercise frequency and HU4 outdoor exercise.[4] *See* **IGO Ex. 10** ¶ 2 & pp. 3-89. The Court should dismiss all other claims for failure to exhaust his available administrative remedies.

Although Plaintiff filed ARPs about jobs and visitation in ARPs 1033-23 and 1703-22, he did not appeal these to the IGO and did not exhaust them,  **IGO Ex. 10** ¶ 2 & pp. 3-89; therefore, the Court must dismiss any jobs and visitation claims.

As to ARP 1214-22, concerning his post-disciplinary hearing stay on HU4, Plaintiff did not complain of conditions of confinement in the initial ARP. **ARC Ex. 9** pp. 47-48; **IGO Ex. 10** pp. 87-89. He mentioned conditions of confinement only in the appeal to Headquarters, **Ex. 9** pp. 43-46; **Ex. 10** pp. 81-86, and did not raise them again at the IGO level, **Ex. 10** pp. 74-79. Thus, as to the HU4 conditions of confinement, he did not exhaust his available administrative remedies within ARP 1214-22 because he did not complain of them in *each* of the three levels. *Woodford v. Ngo,* 548 U.S. 81, 90-91 (2006). "Proper" exhaustion means "using all steps that the agency holds out and doing so *properly* . . . ." *Id.* at 90 (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original)). Skipping the first step, the second step, or the third step in a 3-step process is not proper exhaustion appeal of 1214-22. Here, as to the HU4 conditions, he skipped the first and third steps and failed to exhaust the issue.

Although Plaintiff filed IGO grievance 20221234 about the procedural he did not raise such issues in this lawsuit; because he did not therein address any of the *conditions* of his HU5 confinement in this

---

[4] The IGO letter Plaintiff attached to his complaint following the 1124-22 ARP and appeal at ECF 1-1, 1-2, was based on ARP 1214-22 about having to stay on HU4 after his disciplinary hearing, which is not the subject of this complaint. See ECF 1-3; **IGO Ex. 10** pp. 73-89. ARP 1214-22 and its appeal did not deal with the HU4 conditions of confinement that are the subject of this lawsuit other than dayroom furnishings, which he only mentioned in the second of the three steps, and therefore did not exhaust that issue before filing suit. See **ARC Ex. 9** pp. 26-29; **IGO Ex. 10** pp. 34-56.

grievance, the grievance does not meet exhaustion requirements for the issues in this case.[5] **IGO Ex. 10** ¶ 2 & pp. 3-89.

Plaintiff otherwise initiated no ARPs complaining about out-of-cell education, law library access, or religious services on either HU4 or HU5.[6] **ARC Ex. 9** ¶ 2 & pp. 2-154. Having not exhausted these issues, the Court must dismiss any such claim raised in this case.

Therefore, the Court must dismiss all claims other than for HU4 outside rec and HU4 frequency of indoor rec because Plaintiff failed to exhaust his available administrative remedies.

**D. Plaintiff's Conditions of Segregation Confinement Did Not Violate His Fourteenth Amendment Due Process Rights.**

Following a valid conviction, an individual may be "deprived of his liberty to the extent that the State may confine him and *subject him to the rules of its prison system*" as long as the conditions of confinement do not "otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976) (emphasis added).

In the due process context:

> The punishment of incarcerated prisoners . . . effectuates prison management and prisoner rehabilitative goals. See *State v. Alvey*, 67 Haw. 49, 55, 678 P.2d 5, 9 (1984). Admittedly, prisoners do not shed all constitutional rights at the prison gate, *Wolff,* 418 U.S., at 555, 94 S.Ct., at 2974, but " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Jones,* 433 U.S., at 125, 97 S.Ct., at 2537, quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). **Discipline**

---

[5] Even if he had complained about the procedural aspects of his assignment in this case, his claim would fail because the assignment process complied with governing policy, as did the decision-making team's constitution and the monthly reviews; indeed, they complied with the very demands he made in his grievance. *See* **IGO Ex. 10** pp. 34-40; **McCabe Ex. 5** ¶¶ 10 14.

[6] If Plaintiff were to try to argue that his in-passing mention of HU5 (limited to **HU4** out-of-cell exercise and **HU4** dayroom furnishings) for the first time at the IGO level of appeal of 1124-22, *see* **IGO Ex. 10** pp. 42-47 at 44, somehow exhausted the conditions of confinement on HU5, he is wrong. His failure to mention it at each of the three stages of ARP 1124-22 is a failure to properly exhaust. See *Woodford v. Ngo,* 548 U.S. 81, 90-91 (2006) (requiring the use of each required step). Skipping the first and second steps in a 3-step process is not proper exhaustion. *Id.*

**by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law**.

*Sandin v. Conner*, 515 U.S. 472, 485 (emphasis added). Following the Supreme Court's reasoning in *Sandin*, there appears no liberty interest is implicated in placement on administrative segregation. *See*, *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997); *Reffitt v. Nixon*, 917 F. Supp. 409, 413 (E.D. Va. 1996) *aff'd*, 121 F.3d 699 (4th Cir. 1997).

Inmates are to expect harsher conditions for their own and other inmates' protection when certain conditions are met that warrant their segregation from other inmates. *Prieto v. Clarke*, 780 F.3d 245, 252; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (Pre-*Sandin*, holding "variations of daily routine, changes in conditions of confinement (including administrative segregation) and the denial of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and effectively.")

Where, as here, the conditions do not violate the Eighth Amendment, *see* § IV.E, *infra*, to prove a liberty interest sufficient to trigger due process protections, Plaintiff must establish that there exists mandatory language in state laws or policies which create an enforceable expectation in the subject conditions. In the ordinary course of prison administration and inmate discipline, inmates' due process rights are limited to those situations in which mandatory language in state laws or regulations creates enforceable expectations. *See Wolff v. McDonnell*, 418 U.S. 539, 545 n.5 (1974); *Meachum v. Fano*, 427 U.S. 215, 228 (1976). If an inmate identifies such provisions, he then must prove the adverse action of which he complains subjected him to a sanction that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. *See also*, *Prieto*, 780 F.3d at 251.

"Harsh or atypical prison conditions in and of themselves do not provide the basis of a liberty interest giving rise to Due Process protection." *Prieto*, 780 F.3d at 250. The liberty interest only derives from the Constitution or state law or policy. Thus, if the inmate does not identify mandatory language in state laws or regulations creates enforceable expectations to the challenged activity, then he fails to state a claim for a due process violation for deprivation of the activity, and the matter of harsh and atypical need not be addressed. *Prieto*, 780 F.3d at 249 (quoting *Sandin*).

"[W]hen a state policy expressly and unambiguously *disclaims* a particular expectation, an inmate cannot allege a liberty interest in that expectation." *Prieto*, 780 F.3d at 252. After all, Plaintiff, "like any other inmate, can only be deprived of that to which he is entitled." *Id* at 254.

Therefore, if, on the one hand, the inmate fails to establish policy, law, regulation, or statute that would create a protected liberty interest or if the policy, law, regulations, or, on the other, statutes affirmatively disclaim a particular expectation, then the Court should reject the inmate's claim, dismiss the case, or enter summary judgment for Defendants.

- Plaintiff fails to identify mandates of state law, policy, or regulations that unconditionally provide him with the conditions he demands; in fact, applicable law, policy, and regulations disclaim any such unconditional conditions; therefore, Plaintiff has no liberty interest in them, and the Court should dismiss his claims or enter summary judgment for Defendants

DPSCS policy and publications, including the sources that Plaintiff cites as providing recreation at the frequency he demands, disclaims any liberty interest in the conditions he demands.

Plaintiff asserts he has a liberty interest based on: DPSCS "Executive Directive 145-1, The ACA Standards [sic] for Adult Correctional Facilities, and Section 18B of Maryland CMM, DOC100.0002." as creating a liberty interest. ECF 1 p. 9. Presently, these are known as, Executive Directive, OPS.145.0001; DPSCS, Division of Correction, DOC.100.0002: Case Management Manual, §18 Enemy Alerts; and the American Correctional Association ("ACA"): Performance-Based Standards & Expected

Practices for Adult Correctional Institutions, 5th Ed., March 2021. As a preliminary matter, Plaintiff's cited DOC.100.0002, § 18, does not appear to address the conditions of confinement about which Plaintiff complains. Case Management Manual § 17 does apply to Special Confinement Housing, including administrative and disciplinary segregation. Instead, per DOC.110.0002, § 17 A.2 DOC.110.0006 governs conditions of confinement for AdSeg, § 17 A.2, and DisSeg, § 17.G, and disclaims the interests Plaintiff alleges.

Plaintiff cannot establish that these, or any other, state policy or regulation creates a liberty interest in avoiding the restrictive confinement conditions about which he complains in segregated housing; moreover, there is a paramount safety and security interest in imposing these restrictions given the threat and special vulnerability levels of the two segregation units. Where, as here, the provisions "expressly and unambiguously disclaims a particular expectation, an inmate cannot allege a liberty interest in that expectation." *Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015). Uniformly, applicable policy and regulations proscribe the conditions entirely on segregation or condition them as opportunities subject to prevailing safety and security considerations, and, therefore, offer no guaranteed minimum frequency or availability.

DPSCS policy provides segregation inmates out of cell recreation *where practicable* and *subject to security or safety considerations*. OPS.145.0001.04.B(4)(b); DOC.110.0006.03.A(14). No inmate is guaranteed outdoor education. **ECI Ex. 1** ¶ 6 ; **Kestler Ex. 4** ¶ 11. Clearly, this disclaims any expectation of a guaranteed minimum.

Specifically, applicable policy does not provide an allowance for jobs; thus, there is no liberty interest in jobs. See, DOC.110.0006; ECI110.0006; OPS.145.0001. Applicable policy does not provide out of cell group education; thus there is no liberty interest in it; rather, inmates may study in their cells and education staff visit the tier. DOC.110.0006K; ECI.110.0006.M(3). Applicable policy specifically

proscribes congregate religious services, disclaiming any liberty interest therein; it does provide inmates access to a chaplain and opportunity to pray in their cells. DOC.110.0006.O; ECI.110.0006.05.P (1)-(3). Applicable policy does not provide permission to go to the law library; rather, inmates are afforded delivery to their cells of requested legal research materials, a process Plaintiff has used. **ECI Ex. 1** ¶ 8 & pp. 62-63; DOC.110.0006.M. As to visitation, policy establishes there is no minimum frequency, only a maximum of 1 visit per week, subject to restriction based on conduct or substantial reasons to withhold it. DOC.110.0006.N; ECI.110.0006.03.A(11). Thus, there is no liberty interest in visitation on segregation. *See also*, *White v. Keller*, 438 F.Supp. 110, 115 (D.Md. 1977), *aff'd* 588 F.2d 913 (4th Cir. 1978) (no due process violation in denial of visitation, as it is a privilege, not a right).

Given Plaintiff's failure to identify any grounds for a liberty interest in the challenged conditions, and the fact that state policy and regulations disclaim any liberty interest in those conditions, the analysis stops here and the Court should enter summary judgment for Defendants.

- <u>Assignment to segregation is not atypical; rather, is an expectation of prison life foreseeably triggered by an inmate's behavior</u>.

Where the law informs an inmate that he has no expectation to certain liberties, especially when, under the terms of his incarceration, he is to expect restrictions as both a punishment and a means for the institution to protect other inmates and staff, or to protect the plaintiff himself, there can be no due process violation.

> demotion from administrative segregation to punitive isolation is not the sort of deprivation that qualifies as "atypical and significant." We note first that the Hawaii inmate in *Sandin* was moved from administrative segregation to "disciplinary segregation" for 30 days, much like Kennedy was in this case. [*Sandin*, 515 U.S. at 476 & n. 2] In both *Sandin* and this case, prisoners in administrative segregation and prisoners in the stricter category spend significant amounts of time in "lockdown," confined to their cells. [515 U.S. at 486].

*Kennedy v. Blankenship*, 100 F.3d 640, 642 (8th Cir. 1996) (30 days' "punitive isolation" instead of less-restrictive administrative segregation).

It is not "atypical" for inmates to be placed on administrative segregation for any number of reasons, including a pending adjustment hearing. *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Even long terms of segregation have been found not to implicate a liberty interest under *Sandin*. *See Bonner v. Parke*, 918 F. Supp. 1264, 1270 (N.D. Ind. 1996) (three year term of disciplinary segregation); *Carter v. Carriero*, 905 F. Supp. 99, 104 (W.D.N.Y. 1995) (270 day disciplinary segregation sentence). See also, *Griffin v. Vaughn*, 112 F.3d 703, 706-09 (3d Cir. 1997) (transfer to administrative custody with strict limitations on property, visitation, and out of cell activities did not implicate due process). "[T]he baseline for determining what is 'atypical and significant'—the 'ordinary incidents of prison life'—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." *Griffin*, 112 F.3d at 706. Looking to the state's regulations for administrative custody restrictions, inmates would reasonably expect to, and it was not atypical that they would find themselves in the restricted conditions, sometimes for a substantial period. *Griffin*, 112 F.3d at 708. "Given the considerations that lead to transfers to administrative custody of inmates at risk from others, inmates at risk from themselves, and inmates deemed to be security risks, etc., one can conclude with confidence that stays of many months are not uncommon."). See also, *Freitas v. Ault*, 109 F.3d 1335, 1337 (8th Cir. 1997) (transfer to higher security resulting in loss of prison job).

Also, for example, even where the challenged conditions of confinement were "undeniably severe" and "dehumanizing," "state correctional officials have broad latitude to set prison conditions as they see fit since '[p]rison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the state's interest.'" *Prieto*, 780 F.3d at 254-55 (quoting *Wilkinson*, 545 U.S. at 227).

Plaintiff then, having told correctional staff he wanted to transfer out of ECI, agreed to his placement on AdSeg pending transfer. Of course, Plaintiff's AdSeg pending transfer placement was founded primarily on his escalating misconduct but also on the goal of a transfer. At any time, Plaintiff could

have protested and asked to be removed and placed on general population if he felt the AdSeg conditions were not a price worth paying for the transfer. He chose not to make such a request; therefore, tacitly agreeing to the conditions.

Further, Plaintiff's own experience with disciplinary infractions informed in advance that if he flaunted the rules, he would be subject to restrictive housing; and, his flaunting those rules amounted to an agreement to be subjected to those restrictions.

- <u>Not only did the policies and other material inform Plaintiff that, on segregation, he had no liberty interest in the conditions about which he now complains, but he otherwise knew this and accepted it</u>.

Plaintiff cannot be heard to claim the State, or these Defendants, deprived him of any liberties on HU5 AdSeg pending transfer status because, having taken none of the opportunities to request a return to general population for the entire 9 months of his stay (including in this lawsuit), he willingly accepted those conditions.

Plaintiff cannot complain about dashed expectations of a more liberated experience on HU4 than that which was provided. Plaintiff knew from his long history of disciplinary sanctions that if he violated inmate rules at ECI, he would again be subjected to the restrictions of disciplinary housing, whether as AdSeg PA or DisSeg.

- <u>Plaintiff suffered no substantive due process violation</u>.

In contexts other than disciplinary proceedings, substantive due process adds little to the constitutional protections afforded prison inmates. "[I]t is now well established that the Eighth Amendment 'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater substantive protection 'that does the Cruel and Unusual Punishments Clause.'" *Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir. 1996). The conditions do not violate the Eighth Amendment. See § IV.E, *infra*.

The Fourth Circuit has made it clear that substantive due process is not to be used expansively:

> [C]ourts must be reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this uncharted area are scarce and open-ended, . . . which means that the courts must exercise the utmost care whenever we are asked to break new ground in this field, . . . lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges].

*Hawkins v. Freeman*, 195 F.3d 732, 737 (4th Cir. 1999) (citations and internal quotations omitted).

Moreover, to establish a denial of substantive due process, Plaintiff must, but here cannot, plausibly allege conduct so egregious as to "shock[] the conscience . . . or interfere[] with rights implicit in the concept of ordered liberty." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). The conditions did not shock the conscience. Further, because of the elevated threat presented by DisSeg, AdSeg PA, and some AdSeg inmates, and the vulnerabilities of some of the AdSeg inmates, there were legitimate penological interests in safety and security that required limitations of dayroom movement, furniture in the dayroom, congregations of anything other than the small groups vetted as best as possible for dayroom activities.

### E. Plaintiff's Conditions of Segregation Confinement Did Not Violate His Eighth Amendment Rights.

"The Eighth Amendment is not a basis of broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable. Rather, the Eighth Amendment proscribes the 'unnecessary and wanton infliction of pain.' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (citations omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). Conditions that are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347. *See, e.g., Mickle*, 174 F.3d at 471-72 (administrative

segregation with 23-hour lockup, no radio or TV, five hours of exercise a week, and exclusion from all programs did not violate the Eighth Amendment because it did not deny a "basic human need").

Isolation, inactivity, discomfort, and inconvenience do not in and of themselves violate the Constitution. *Mickle*, 174 F.3d at 471-72 (indefinite administrative segregation); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (filthy, vermin-infested, and flooded conditions, with unbearably hot cells, cold food, and smaller portions, no clean clothing or bedding, no outdoor recreation, etc., for six months were not atypical and significant); *Sweet v. S. Carolina Dep't of Corr.*, 529 F.2d 854, 861 (4th Cir. 1975) (prolonged segregation). *See also Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (*loss of out-of-cell exercise privileges for one year*).

To make out a claim that prison conditions amount to cruel and unusual punishment, an inmate must have suffered actual, serious harm from the challenged conditions. Under the PLRA, 42 U.S.C. § 1997e(e), an inmate cannot sue for damages for emotional or mental injury absent evidence of physical injury caused by the alleged conditions. *Martin v. Duffy*, 977 F.3d 294, 301 (4th Cir. 2020); *see also*, *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993) (double bunking, lack of exercise and inadequate ventilation, without evidence of actual harm, not cruel and unusual punishment); *Richmond v. Stigile*, 22 F. Supp. 2d 476, 480 (D. Md. 1998); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (no entitlement to presumption of actual harm); *see also*, *See, Rodriguez v. Thomas*, 299 F. Supp. 3d 618, 639 (M.D. Pa. 2018) (temporary denial of exercise for 91 days with no medical effects is not substantial deprivation)(citing *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (denial of recreation for twenty-one days insufficient to sustain an Eighth Amendment claim). Here, Plaintiff alleges no physical injury from his segregation housing or related restrictions, and the Court should dismiss his claim.

Moreover, the Eighth Amendment does not prohibit cruel and unusual *conditions*, it prohibits cruel and unusual *punishments*. In addition to the objective element discussed above, a claim of

unconstitutional conditions of confinement also requires "a prisoner to prove…'*subjectively* the officials acted with a sufficiently culpable state of mind.'" *Shakka*, 71 F.3d at 166 (emphasis in original; citation omitted). To have a sufficiently culpable state of mind, the defendants must have acted with deliberate indifference to the allegedly unconstitutional conditions. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Mickle*, 174 F.3d at 472; *Strickler*, *v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). A finding of deliberate indifference requires that the defendant both "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837. Moreover, the conditions must be so severe that the defendants could be charged with "fair warning that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 313 (4th Cir. 2006).

Conditions here were not severe. Indeed, Plaintiff tacitly agreed the conditions were acceptable, given that he could at any time in HU5 have asked to be removed to general population, but chose not to. **McCabe Ex. 5 ¶¶ 12, 15; Bailey Ex. 7 ; Donoway Ex. 6 ¶ 11; Wilson Ex. 8 ¶ 6; DeVaughn Ex. 3 ¶16.**[7] The decision to place Plaintiff on AdSeg pending transfer by the Special Housing Committee, including consultation with Plaintiff, was reasonable and in keeping with DPSCS's goal of safety and security for inmates and staff, as well as designed to expedite Plaintiff's desired transfer. *See* **Kestler Ex. 4 ¶ 14, 15, 16; DeVaughn Ex. 3 ¶¶ 11-14; McCabe Ex. 5 ¶ 8.** The opposite of inhumane, this was for Plaintiff's safety and security and his best option for a transfer to an institution at which he might find a better fit. *Id*.

---

[7] A failure to complain when given a chance to seek relief, as here, is a tacit admission that Plaintiff believed there was no cause for complaint; this is especially so where the plaintiff had previously complained about similar situations or took an opportunity to complain about other aspects of the situation. *See, e.g., Frodge v. US*., 204 Ct. Cl 812 (1975) (adopting 1974 WL 20327, *8, 180 U.S.P.Q. 583 (1974)).

In his ARP 1124-22, Plaintiff admits that on HU4 he had 3 hours of exercise per week. **ARC Ex. 9** pp. 22-24. That he wanted more does not amount to inhumane treatment. Plaintiff was able to exercise in his cell. **ECI Ex. 1** ¶ 8; **Kestler Ex. 4** ¶ 5; **Donoway Ex. 6** ¶ 5. Nor are the remaining conditions about which he complains basic human needs, the denial of which could violate his Eighth Amendment rights; therefore, the Court should dismiss his claim. *see, e.g*., *Beverati*, *supra*, 120 F.3d at 504; *Strickler*, 989 F.2d at 1379; *Pearson*, 237 F.3d at 886.

### F.   Plaintiff Has No Cause of Action for Any Limitations on Jobs and Programs

Plaintiff complains in a cursory way that he was not able to work. ECF 1 p. 9. There is no constitutional right to participate in any in-prison program, including jobs. *See, e.g., Sandin*, 515 U.S. at 484; *Paoli v. Lally*, 812 F.2d 1489 (4th Cir. 1987); *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978) (work assignments are at prison officials' discretion); *Hoptowit,* 682 F.2d at 1254-55 (no right to job); *Garrett v. Angelone*, 940 F. Supp. 933, 942 (W.D. Va. 1996) *aff'd,* 107 F.3d 865 (4th Cir. 1997) (no constitutional right to job in prison); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) (loss of job upon segregation not atypical and significant hardship).

### G.   Plaintiff Fails to State a Claim for Denial of Access to the Courts.

Plaintiff complains in a cursory way an alleged lack of access to the law library. ECF 1 p. 9. To the extent that the Court construes this as a claim for denial of access to the courts, the Court should dismiss the complaint, or, in the alternative, grant summary judgment for Defendants.

An inmate's federally protected right of access to court is very limited. It is simply the right to present certain types of meritorious grievances to the courts, *Plyler v. Moore*, 100 F.3d 365, 373 (4th Cir. 1996), not to have all the tools the inmate may consider necessary to litigate that grievance effectively, nor is it an abstract right of access to legal materials in and of themselves. *Lewis v. Casey*, 518 U.S. 343, 354 (1996). The right of access extends only to an inmate's challenges to his conviction or to civil rights actions brought to enforce basic constitutional rights. *Lewis*, 518 U.S. at 355. "Impairment of any other

litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

To make out a valid federal constitutional claim of denial of access to court, the inmate must allege and prove more than denial of access to particular legal materials. He must show that he has suffered actual prejudice to his ability to proceed with a particular protected legal claim. *See Strickler*, 989 F.2d at 1383; *Bernadou v. Purnell*, 836 F. Supp. 319, 325 (D. Md. 1993) *aff'd sub nom. Bernadou v. Rollins*, 8 F.3d 816 (4th Cir. 1993). Here, actual prejudice is concrete harm such as the inability to meet a filing deadline or that the inmate was "so stymied by inadequacies of the law library that he was unable even to file a complaint." *See, e.g., Lewis,* 518 U.S. at 349, 351. Plaintiff also must "affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018).

Plaintiff alleges no actions by any of the Defendants related to his access to the law library, or any specific requests that were denied. He alleges no consequent harm. Therefore, the Court should dismiss his complaint. Moreover, in segregation, Plaintiff had access to legal research on his tablet and through LASI and received legal materials through the LASI program. **ECI Ex. 1 ¶ 8; Donoway Ex. 6 ¶ 5.**

### H. Plaintiff Failed to State a Claim for Interference with His Religion.

Plaintiff also complains in a cursory way that, while in segregation, he could not attend religious services. ECF 1 p. 9. He provides no detail to substantiate this and fails to state a claim. See § III.A. *supra*.

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA" or the "Act") is the current federal statutory law on prisoners' religious rights. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2774 (2014). It provides, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates" that the burden is "in furtherance of a

compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc. RLUIPA does not afford prisoners the unfettered right to religious exercise. *Rodgers v. Shearidin*, No. CIV.A. CCB-09-1962, 2011 WL 4459092, at *24 (D. Md. Sept. 22, 2011).

Prison security is a compelling state interest; thus, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005) (noting that lawmakers supporting RLUIPA "anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.") (quoting joint statement of Sen. Hatch and Sen. Kennedy, RLUIPA's co-sponsors) (internal citation and quotation marks omitted); *see also*, *McRae v. Johnson*, 261 F. App'x 554, 558 (4th Cir. 2008); *Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012); *Turner v. Safley*, 482 U.S. 78, 84 (1987); *Lovelace v. Lee*, 472 F.3d 174, 189-90 (4th Cir. 2006). *Lovelace*, 472 F.3d at 189-90; *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999) ("The rationale for judicial deference is greatest when the maintenance of prison order is at stake.")

The First Amendment, which, like RLUIPA, permits restrictions on religious practice that are "reasonably related to legitimate penological interests," offers less protection to inmates' free exercise rights than RLUIPA. *Lovelace* 472 F.3d at 199-200 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

RLUIPA claims cannot be sustained against officials acting in their individual capacity. *Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 659-60 (D. Md. 2009) (quoting *Smith v. Allen,* 502 F.3d 1255 (11th Cir. 2007)); *Rendelman v. Rouse,* 569 F.3d 182, 187-89 (4th Cir. 2009) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Defendants are immune in their official

capacity. See § IV.A, *supra*. The Court should dismiss any RLUIPA claim in this case.

Where a plaintiff cannot sustain a RLUIPA claim, there is no need for a First Amendment analysis because the claim will fail there also. *See, e.g., Tillman v. Allen*, 187 F.Supp.3d 664, 675 (E.D.Va. 2016); *Lovelace*, 472 F.3d at 198 n. 8; *Rodgers v. Jackson*, 2017 WL 4246866, at * 9.

To sustain a claim for interference with his religious practice, Plaintiff first must establish a *prima facie* case that prison officials intentionally imposed a substantial burden on his religious exercise. *see Lovelace*, 472 F.3d at 189, 194. "Substantial burden" is an imposition "that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, ... or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." *Lovelace*, 472 F.3d at 187 (quotations, citation, and alterations omitted).

Plaintiff offers no allegations to describe any impact on his personal religious practices. Moreover, lack of congregate services during segregation did not force Plaintiff to decide between forfeiting government benefits and following his religious precepts of his religion, particularly on HU5, from which he could, but did not, ask to be extricated.

> Without more, a denial of group religious services in a prison environment, where security is a primary concern, does not demonstrate a substantial burden on the exercise of religion if inmates are allowed to receive religious material and to have visits from a minister. Maintaining order and security in a jail understandably provides jail personnel cause for concern whenever presented with the possibility of groups of prisoners congregating outside their cells. Further, because he was allowed to receive religious material and to have visits with a minister, Counts had alternate channels to practice his religion. Any burden caused by the denial of group services is offset by these reasonable opportunities to practice his religion.

*Counts v. Newhart*, 951 F. Supp. 579, 590 (E.D. Va. 1996), *aff'd*, 116 F.3d 1473 (4th Cir. 1997). Plaintiff does not aver that he was denied individual prayer. In fact, he was able to pray and have religious books in his cell while on segregation. **ECI Ex. 1 ¶ 8; Kestler Ex. 4 ¶ 4;** ECI.110.0006.05.P (1), (2).

Further, in assessing whether a regulation is unduly restrictive on inmates' free exercise rights, courts employ the reasonableness test set out by the Supreme Court in *Turner* and reiterated in *Lovelace*. Under the *Turner* test, action by prison officials that infringes on a prisoner's First Amendment rights is valid if it is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89. The segregation population presents security and safety risks to each other, which prevents congregate services based on having religion in common. Whereas small dayroom groups are curated for compatibility as much as possible, the fact that people had religion in common was not a sufficient reason to trust their safety within such a group; nor was there sufficient staffing to accommodate such groupings, when other priorities such as medical care and food distribution had priority for obvious reasons. Thus, because of the increased risk to inmate safety presented by inmates placed for disciplinary issues on HU4 or for other specialized reasons on HU5, for inmate safety and institutional security congregate religious services could not be provided for segregation inmates. **Kestler Ex. 4 ¶ 4; Donoway Ex. 6 ¶ 8**. DPSCS informed inmates they "are permitted to practice the approved religion of [their] choice *as long as institutional security is not affected*." **ECI Ex. 1** p. 12 (Handbook § II.R (emphasis added)).

Given that Plaintiff was afforded opportunity to worship in his cell and have access to a chaplain, DOC.110.0006.O; ECI.110.0006.05.P (1) and (3), and given the prevailing security issues in segregation, lack of congregate services did not violate Plaintiff's rights.

The Court should dispose of his claim in Defendants' favor.

**I.  Visitation**

Plaintiff has no cause of action with respect to visitation. There is no due process violation in denial of visitation: visitation is a privilege, not a right. *See White v. Keller*, 438 F. Supp. at 115; *see also*, *Overton v. Bazzetta*, 539 U.S. 126, 132, 136 (2003) (legitimate security interest in limiting visitation; denial of visitation does not deprive inmates of basic human rights, or present inhumane conditions).

That Plaintiff wanted more visitation than what he admitted he was receiving does not give rise to claims of constitutional violations.

### J.  There is No *Respondeat Superior* Liability in this Case.

There is no *respondeat superior* liability under §1983. *Monell v. New York Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). Supervisory correctional officials can be held liable only for their own personal wrongdoing or for supervisory actions that directly violate constitutional norms; there must be personal involvement by the defendants. *Shaw v. Stroud,* 13 F.3d 791 (4th Cir.), cert. denied, 513 U.S. 813 (1994)*; see also, Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir. 1977). To establish supervisory liability in a §1983 action in general, the Fourth Circuit has held that Plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799. *See, e.g., Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999) (no supervisory liability without direct knowledge and active decision-making).

Plaintiff fails to state a claim for *respondeat superior* liability of any of the Defendants. He offers no allegations that any supervisory defendants were personally involved in the matters about which he complains. They were not. See § IV.B, *supra*. Thus, the Court should dispose of any supervisory claims in Defendants' favor.

### L.  Qualified Immunity Precludes Liability

By design, qualified immunity is meant to protect Defendants not simply from liability but also from the vexations of litigation, including discovery. *See, Crawford-el v. Britton*, 118 S.Ct. 1584 (1998); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, the Court must determine Defendants' entitlement to qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S.

224, 227 (1991).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A qualified immunity analysis generally turns to the "objective reasonableness of the action, assessed in light of the legal rules that were clearly established at the time the action was taken." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Mitchell v. Forsyth, supra*. Qualified immunity "is intended to allow public officials to act, with independence and without fear of consequences, where their actions do not implicate clearly established rights." *Turner v. Dammon*, 848 F.2d 440, 443 (4th Cir. 1988) (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). It "protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines,'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Summer*, 973 F.2d 295, 298 (4th Cir. 1992), protecting them for mistakes of law, of fact, or both, *see Groh v. Ramirez,* 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting); *Peterson v. Davis*, 551 F.Supp. 137 (1982), *aff'd*, 729 F.2d 1453 (1984) (application to correctional officers).

Qualified immunity protects these Defendants because the evidence establishes that they did not violate any clearly established constitutional right of which a reasonable public official should have known. *See, Harlow v. Fitzgerald*, *supra*; *Anderson v. Creighton*, 483 U.S. 635 (1987); *Turner v. Dammon, supra*; *Taratino v. Baker*, 825 F.2d 772 (4th Cir. 1987); *Wilson v. Layne*, 526 U.S. 603 (1999). No clearly established law having been violated, the prison officials were entitled to qualified immunity. *Winfield v. Bass*, 106 F.3d 525, 532-33 (4th Cir. 1997).

Defendants did not conduct themselves in any way that would have caused them to believe they clearly were violating Plaintiff's constitutional rights, because, of course, they were not. His assignment

to HU4 AdSeg PA and to HU5 pending transfer was reasonable, based on the legitimate penological interest in safety and security, including Plaintiff's own and other inmates' and staff safety, and his goal of a transfer; further, the restrictions on segregation did not deprive him of basic human needs, or substantially burden his religious beliefs. Plaintiff expressed agreement with the AdSeg pending transfer assignment at all times. There was no conduct by Defendants that approached, let alone, passed the threshold for believing, or finding, a violation of Plaintiff's constitutional rights. Therefore, the Court should dispose of Plaintiff's complaint in Defendants' favor.

### L.  The Court Should Deny Plaintiff's Request for Injunctive Relief.

Plaintiff demands an order that Warden Bailey, Director of Security Operations Harvey, and IGO Director Taylor provide outdoor exercise opportunities for ECI's DisSeg and AdSeg inmates. ECF 1 p. 12 ¶ 17. He also demands the Court order segregation inmates to be seen by a Review Team every thirty days in accordance with DOC.100.0002. ECF 1 p. 11, 12 ¶ 17. As for this latter provision, no injunction can issue as to any presently existing requirements because a further layer of protection is not necessary. *See*, *Hylind v. Xerox Corp.*, 749 F. Supp. 2d 340, 353 (D. Md. 2010), *aff'd in part, rev'd in part on other grounds and remanded,* 481 F. App'x 819 (4th Cir. 2012).

As for both of these demands, Plaintiff has no standing to raise claims on behalf of other inmates, and the Court may not entertain them. *See*, *e.g.*, *Hummer v. Dalton*, 667 F.2d 621, 625-26 (4th Cir. 1981)(a *pro se* litigant's "suit is … confined to redress for violation of his own personal right" and he cannot act as a "knight-errant" for others); *Inmates v. Owens*, 561 F.2d 560, 562-63 (4th Cir. 1977) (a pro se inmate does not have standing to sue on behalf of another inmate.)

Further, the request that this Court require prison officials to provide outdoor exercise to inmates in special confinement would be overreaching in a way that the law does not allow, even if they had the authority to carry out such an order. Absent the most extraordinary circumstances, a federal court should not issue an injunction against a state prison concerning prison management. The Supreme Court has

repeatedly emphasized that prison administrators, not the federal courts, must "manage penal institutions." *Turner,* 482 U.S. at 84-85. Prison officials must be given "wide ranging deference" in pursuing legitimate penological concerns. *Jones v. North Carolina Prisoners Labor Union*, 443 U.S. 119, 126 (1977); *see also Taylor v. Freeman*, 14 F.3d 266, 268 (4th Cir. 1993) (no federal injunction against State prisons "absent the most extraordinary circumstances;" federal courts should not immerse themselves in prison management); *Wetzel v. Edwards,* 635 F.2d at 288. Moreover, Plaintiff cannot use his claims in this lawsuit for broad prison reform. *Hoptowit,* 682 F.2d at 1246.

Further, Plaintiff has no standing to demand such changes to housing measures at because, as of August 4, 2023, nearly a year after ECI began its continued efforts to transfer Plaintiff (thus, Plaintiff was not transferred to "moot" the case), Plaintiff was transferred to RCI. **ECI Ex. 1** p. 4. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (transfer to another facility moots inmate's claims for injunctive relief); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987).

## V. CONCLUSION

The Court should dismiss Plaintiff's complaint, or, in the alternative, grant summary judgment in Defendants' favor.

Respectfully submitted,
ANTHONY G. BROWN
Attorney General of Maryland


_____/s/_____
TERESA M. KELLY
Assistant Attorney General
Federal Bar No. 09034

St. Paul Plaza - 19th Floor
200 St. Paul Place
Baltimore, Maryland  21202
(410) 576-7962 (Telephone)
(410) 576-6880 (Telefax)
E-mail: tkelly@oag.state.md.us

Attorneys for Defendants