## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SAMUEL SMALLS,[1]

    Plaintiff,

    v.

    Civil Action No.: BAH-23-723

WILLIAM BAILEY, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Pending in this civil rights case is Defendants' Motion to Dismiss, or in the alternative, for Summary Judgment. ECF 21. The motion is opposed by pro se Plaintiff Samuel Smalls ("Smalls" or "Plaintiff"). ECF 29.[2] No hearing is required to resolve the pending matters. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, the motion, construed as one seeking summary judgment, shall be granted.

### I.    BACKGROUND

Smalls, who at all times relevant has been incarcerated at Eastern Correctional Institution ("ECI"), alleges that on August 23, 2022, and on November 7, 2022, he filed Administrative Remedy Procedure complaints ("ARPs") with ECI Warden William Bailey concerning ECI policy and procedure that prohibits out-of-cell, outdoor exercise and recreation for inmates who are assigned to disciplinary and administrative segregation. ECF 1, at 3–4 (ARP ECI-1124-22).

---

[1] Plaintiff's name is improperly spelled "Small" several times in the pleadings filed by Defendants.

[2] After requiring counsel to provide redacted versions of the exhibits Defendants filed under seal, Smalls filed a supplemental Opposition Response. ECF 42. The supplemental Opposition Response is not limited to the content of the redacted exhibits as set forth in the Court's Order (ECF 39) and it will therefore not be considered.

Smalls explains that he was assigned to disciplinary segregation when he filed his first ARP but was removed from disciplinary segregation (HU #4) on September 8, 2022. *Id.* at 4. Smalls was then placed on "administrative segregation special confinement" (HU #5). *Id.* Smalls contends that he has been assigned to segregation housing since August 18, 2022, and as a consequence has been denied all out-of-cell exercise, outdoor activities, and indoor exercise opportunities. *Id.* According to Smalls, ECI does not provide dayrooms or multi-purpose rooms equipped with exercise equipment for use by inmates assigned to either form of segregation. *Id.*

Smalls asserts that his placement in segregation housing and the deprivation of all out-of-cell exercise violates his Eighth and Fourteenth Amendment rights. ECF 1, at 7. He argues that he has a liberty interest conferred upon him by the Department of Public Safety and Correctional Services ("DPSCS") Executive Directive 145-1, the ADA standards for Adult Correctional Facilities, and "Section 18B of Maryland [Case Management Manual], [Division of Correction] 100.0002." *Id.* In Smalls' view, these regulations and standards give him a right to avoid the conditions under which he has been confined. *Id.* Additionally, Smalls asserts that the refusal to provide outside recreation amounts to cruel and unusual punishment. *Id.* at 8. He asserts that allowing inmates to go outside and to leave the confines of their cells is required by minimal civilized measures of life's necessities. *Id.*

Smalls describes the conditions of his confinement in segregation as including being kept in his cell alone for 23 hours per day and 24 hours on weekends and holidays. ECF 1, at 9. He alleges he was denied outdoor recreation and denied indoor exercise as a result of having no exercise equipment. *Id.* He also states that he is denied various privileges afforded to general population inmates such as work assignments, school attendance, religious services attendance,

and access to the law library. *Id.* He adds that segregation inmates are allowed one 15-minute visit every three weeks. *Id.*

Smalls claims that he "has been and will continue to be irreparably injured" by his long-term assignment to segregation housing and the deprivation of out-of-cell activities, but he does not describe the nature of that harm. ECF 1, at 12. As relief he seeks a declaratory judgment, permanent injunctive relief, and compensatory and punitive damages. *Id.* at 11–12.

In a supplemental filing, Smalls submitted declarations from six other inmates who are also housed on administrative segregation at ECI. ECF 11-2 through ECF 11-10. Each affiant states that he has not been given outdoor exercise or recreation since being assigned to administrative segregation. *Id.* The declarations were filed on June 7, 2023; the men have been assigned to segregation for periods of time ranging from 3 to 10 months; and only one of the men has been seen by case management three times while the others have only been seen once or twice during the time they have been so confined. ECFs 11-5, 11-6, 11-17, 11-8, 11-9, and 11-10. Neither the declarants nor Smalls specifically describes any deleterious effect on their health caused by their confinement to segregation.

Defendants explain that Smalls was assigned to administrative segregation pending adjustment on August 18, 2022, after he was charged with disobeying an order by refusing to wear approved clothing for a court trip. ECF 22-1, at 3 ¶ 5. At an adjustment hearing held on August 29, 2022, the charge was reduced to an incident report. ECF 21-4, at 6–7. Notwithstanding that disposition, Smalls remained on administrative segregation in HU #4. ECF 21-6, at 4 ¶¶ 13–14 (Decl. of Lieutenant Kestler). According to Lt. Kestler, while Smalls was housed in HU #4, both before and after his adjustment hearing, he requested access to the same type of property he would be allowed if he were in general population. *Id.* ¶ 13. The request was denied, and Smalls was

advised that he could not have that type of property until he left HU #4. *Id.* Lt. Kestler explains Smalls remained in HU #4 after the infraction was reduced to an incident report because there is a delay between adjustment hearings and the posting of the decisions rendered as a result and there were no available beds in general population at the time. *Id., see also* ECF 22-1, at 3 ¶ 6 (noting the adjustment record was uploaded on August 31, 2022).

In an apparent attempt to ameliorate Smalls' housing assignment, Lt. Kestler told Smalls that while they could not move him to general population due to the lack of an available bed, Smalls could be recommended for assignment to Administrative Segregation ("AdSeg") pending transfer to another institution. ECF 21-6, at 4 ¶ 14. The benefit to Smalls was that he could move out of HU #4, he could have access to his property, and he would get transferred to another prison sooner. *Id.* Lt. Kestler adds that "placing inmate Small[s] on AdSeg pending transfer would help meet his goals and possibly get him into an institutional facility in which he could do better, while reducing the threat to safety, security, and the good order of the institution that [Smalls] had presented by disobeying the rules and being disruptive in general population." *Id.* Smalls allegedly agreed to the new housing assignment. *Id.*

Lt. Kestler, Captain Roslak, and Case Manger Devaughn, all of whom serve on the Segregation Review Committee, agreed with the recommendation to place Smalls on administrative segregation pending transfer. ECF 21-6, at 4 ¶ 15. Pursuant to the agreement, Smalls was moved to HU #5. *Id.* at 5 ¶ 18. Smalls was later transferred to Roxbury Correctional Institution ("RCI") on August 4, 2023. *Id.* at ¶ 20. Smalls was placed into general population on June 21, 2023, less than two months before he was transferred to RCI. ECF 22-2, at 3 ¶ 9. According to Lt. Kestler, Smalls' transfer occurred more than one year earlier than it would have

4

had he waited for a lateral transfer[3] while assigned to general population. ECF 21-6, at 4 ¶ 20; ECF 22-2, at 2 ¶ 4. Defendants maintain that Smalls could have asked to be removed from administrative segregation pending his transfer upon Smalls' request and at any time, but they allege that they were not made aware of any such request. ECF 21-6, at 5 ¶ 21; ECF 21-9, at 2–3 ¶¶ 5 and 6; ECF 21-10, at 3 ¶ 6; ECF 22-1, at 5 ¶ 16; and ECF 22-2, at 4–5 ¶¶ 12 and 15.

According to Captain Derr, HU #4 includes inmates who have been found guilty of an infraction and had sanctions imposed by a hearing officer as well as inmates who have not yet had a hearing on an inmate rule violation. ECF 21-3, at 2 ¶ 4. He adds that "[b]ecause the inmates on HU #4 have demonstrated behavior that presents a heightened threat to institutional safety and security, inmates on HU #4 are subject to restrictions to protect other inmates and staff as well as to deter other violations." *Id.*

In contrast, Captain Derr states that HU #5, B and C tiers, houses administrative segregation status inmates. ECF 21-3, at 3 ¶ 5. Inmates in that housing unit were there either because they were "under investigation or required segregation from the general population for specific reasons." *Id.* Such reasons include assignments pending protective custody, pending transfer, being involved in an assault related to a Security Threat Group ("STG"), being threatened by STGs, and having issues with staff or with other housing assignments. *Id.* In addition, inmates may be assigned to administrative segregation if "their continued misbehavior demonstrates an inability to conform to the rules and regulations of the institution, the Division [of Corrections], or both." *Id.* Captain Derr claims that administrative segregation inmates in HU #5 are allowed to

---

[3] A "lateral transfer" is a transfer to another institution after an inmate has been housed at his current institution for a minimum of two years, has not received a guilty finding for an institutional rule violation for at least two years, and has been removed from disciplinary segregation for at least two years. ECF 22-2, at 2 ¶ 3 (Declaration of Arpadiana McCabe).

possess the same property that general population inmates are allowed to possess, they "are free to walk around the dayroom and shower, and are not required to shower in restraints." *Id.*

When Smalls was housed at ECI in HU #4 and HU #5, the "dayrooms did not have tables and chairs due to the risk of hiding contraband, which could jeopardize the safety and security [of] inmates, staff, and the institution." ECF 21-3, at 3 ¶ 7. Defendants maintain that the inmates assigned to these housing units "are able to exercise in their cells, doing calisthenics and other forms of exercise." *Id.* ¶ 8.

With respect to the review procedures utilized in connection with Smalls' placement in both HU #4 and HU #5, Defendants offer descriptions of Case Management review procedures that took place in Smalls' case. When Smalls' Adjustment Record was updated to reflect that his infraction was reduced to an incident report, the Special Segregation Committee met and discussed Smalls' housing assignment. ECF 21-5, at 3 ¶¶ 6 and 7. The committee consisted of seventeen people and included a psychologist, intelligence officers, Case Manger DeVaughn, other case managers, Captain Roslak, as well as other high ranking correctional officers. *Id.* ¶ 7. Captain Roslak told the group that Smalls' past behavioral issues had "escalated to an infraction" and asked the committee if Smalls could be transferred out of ECI. *id.* ¶ 8. At the time, there were no spaces available in general population at ECI and Smalls was therefore left in HU #4 pending the next meeting of the committee the following week. *Id.* That meeting occurred on September 7, 2022.

On September 7, 2022, Captain Roslak recommended that Smalls be placed on a transfer list because Smalls presented security concerns due to his apparent difficulties with following rules governing safety and security. ECF 21-5, at 3 ¶ 9. In his declaration, DeVaughn explains that

Smalls had been "unhappy with conditions at ECI from his arrival and . . . his NOIRV[4] within one month of arrival signified an escalation of his discontent." *Id.* at 4 ¶ 11. In DeVaughn's view, Smalls was "likely to escalate further, putting inmates, staff, and Mr. Small[s] at risk of harm." *Id.* DeVaughn and Lt. Kestler agreed with Roslak's recommendation "that to expedite inmate Small[s'] transfer and mitigate any risk of further disruption and safety and security risk suggested by his behavior, he should be placed on AdSeg pending transfer." *Id.* ¶ 10, *see also* ECF 21-6, at 4–5 ¶ 15; ECF 22-2, at 3 ¶ 8. Smalls was notified by Lt. Kestler of this decision on September 8, 2023. ECF 21-6, at 4–5 ¶ 15. The written notice provided to Smalls bears his signature. *Id.* at 6. Defendants maintain that placing Smalls in administrative segregation pending transfer was the "best option" for Smalls because Smalls said he wanted a transfer, and it "would help move [Smalls] out of ECI to an institution where he might find a better fit sooner than he could through a lateral transfer request." ECF 21-5, at 4 ¶ 12; ECF 21-6, at 4–5 ¶ 15; ECF 22-2, at 3 ¶ 8.

Smalls was moved from HU #4 to HU #5 where Arpadiana McCabe was his case manager. ECF 22-2, at 3 ¶ 6. On September 15, 2022, an "AdSeg team" consisting of "an Intelligence Officer Sergeant, another Intelligence Officer, ECI's Chief of Psychology, another CCMS-II" and McCabe met with Smalls. *Id.* ¶ 10. They explained the rationale behind placing him on administrative segregation pending transfer and the transfer process which, they explained, could occur within a week or in twelve months. *Id.* According to McCabe, Smalls voiced no concerns and agreed to the administrative segregation assignment. *Id.* Warden Bailey approved Smalls' assignment to HU #5 on September 19, 2022. *Id.* at 4 ¶ 11. Once Warden Bailey approved the assignment, Smalls' name and updated information was sent to Division of Correction

---

[4] "NOIRV" is an acronym for Notice of Inmate Rule Violation. *See Mills v. Bishop*, Civ. No. 22-1512-LKG, 2024 WL 185351, at *5 (D. Md. Jan. 17, 2024).

headquarters weekly so he could be transferred "when a suitable bed became available." *Id.* at 5 ¶ 16.  While Defendants maintain that assignment to administrative segregation pending transfer "is not unusual or atypical" and cite to DOC.100.00002 § 17.B as support for the placement, the Court notes that nothing in that policy appears to mention administrative segregation pending a transfer. *See* ECF 21-5, at 4 ¶ 12; ECF 22-1, at 4 ¶ 12; ECF 22-2, at 3 ¶ 8, *see also* DPSCS, DOC Case Management Manual, DOC 100.0002 § 17.B, at 126–30, https://itcd.dpscs.state.md.us/PIA/ShowFile?fileID=578 (last viewed Sept. 4, 2024).

After Smalls' placement in HU #5 was approved, the Segregation Review Committee met on a monthly basis and when discussing Smalls' housing assignment, the Committee agreed to keep Smalls in administrative segregation.  ECF 22-2, at 4 ¶ 14.  According to McCabe, the Committee met on October 13, 2022; November 10, 2022; December 8, 2022; January 3 and 31, 2023; February 28, 2023; March 28, 2023; April 25, 2023; and May 23, 2023.  *Id.*  Although Smalls was notified of the Committee's decisions, there is no indication in the record that Smalls attended any of those meetings.  Defendants assert that Smalls could have contacted [them] and requested removal to general population" but "he did not do so."  *Id.* ¶¶ 12, 14; ECF 21-5, at 5 ¶ 16; ECF 21-8, at 4 ¶ 11; ECF 21-9, at 3 ¶ 6; and ECF 21-10, at 3–4 ¶ 6.

Transferring Smalls to another prison was purportedly complicated by the fact that he "had enemies at other medium security prisons."  ECF 22-2, at 5 ¶ 17.  In February of 2023, McCabe alleges that he contacted staff at Western Correctional Institution ("WCI"), where at least one of Smalls' purported enemies was detained, and inquired "if it was possible to ask his enemy there to retract the enemy report, which would open up WCI as an option for [] Smalls' transfer." *Id.* ¶ 18.  As a result, Smalls' alleged "enemy" at WCI retracted the enemy report, making WCI a possible destination for Smalls' transfer.  *Id.*  Additionally, McCabe notes that Smalls was not technically

8

eligible for a transfer out of ECI under the DPSCS policy. ECF 21-5, at 4 ¶ 13. Under that policy,

an inmate may only "request a lateral transfer to another institution if he has been housed at his

then-current institution for a minimum of two years, has not received a guilty finding for an

institutional rule violation for at least two years, and has been removed from disciplinary

segregation for at least two years." *Id.* (citing DPSCS, DOC Case Management Manual, DOC

100.0002 § 6.A(1), at 53, https://itcd.dpscs.state.md.us/PIA/ShowFile?fileID=578 (last viewed

Sept. 4, 2024)).

On June 21, 2023, Smalls was removed from administrative segregation pending a transfer

and placed in general population at ECI. ECF 22-2, at 5 ¶ 19. The Special Housing Committee

decided to move Smalls to general population "in part" because "Smalls' transfer was especially

difficult because of his enemy situation at other facilities and efforts to negotiate a swap of transfer-

listed inmates with other institutions was not successful." *Id.* Smalls did, however, remain on the

transfer list after being moved to general population. *Id.* According to McCabe, staff hoped that

Smalls would "better follow institutional rules" and his assignment to general population would

"give him another chance to attend programs and better himself." *Id.*

On August 4, 2023, Smalls was transferred to Roxbury Correctional Institution ("RCI") in

Hagerstown, Maryland. ECF 21-6, at 5 ¶ 20; ECF 22-2, at 5 ¶ 20; ECF 21-8, at 5 ¶ 13. Defendants

assert that Smalls obtained his desired transfer "more than a year earlier than he would have been

eligible to transfer by lateral request as a general population inmate." ECF 26, at 5 ¶ 20.

Defendants do not deny that there are restrictions in place for administrative segregation

inmates that do not apply to general population. For example, they differentiate the population in

HU #4 from the population in HU #5.[5]  ECF 21-8, at 3 ¶ 6; ECF 21-3 at 2-3, ¶¶ 4, 5.  Captain Derr

explains that HU #4 houses inmates who are assigned to disciplinary segregation based on

sanctions imposed after they were found guilty of an infraction. ECF 21-3, at 2 ¶ 4.  "It also houses

inmates who have received an infraction and who have not yet had the hearing on inmate rule

violation charges; this status is known as administrative segregation pending adjustment."  *Id.*  Due

to their "demonstrated behavior that presents a heightened threat to institutional safety and

security, inmates on HU 4 are subject to restrictions to protect other inmates and staff as well as to

deter other violations."  *Id.*  Lt. Donoway states that disciplinary segregation inmates in HU #4 are

subject to more restrictions on their movement, the property they may possess, access to the phone,

and other activities.  ECF 21-8, at 3 ¶ 6.

According to Captain Derr, "[d]uring the time that inmate Small was ECI," inmates

assigned to HU #5 included inmates who were being investigated or needed to be segregated from

general population pending protective custody, inmates pending a transfer, inmates who were

involved in a gang-related assault, inmates who were being threatened by a gang, "staff issues,"

and "housing issues."  ECF 21-3, at 3 ¶ 5.  Lt. Donoway states that HU #5 inmates "are allowed

to possess the same property as if they were in [the] general population."  ECF 21-8, at 2-3 ¶ 4.

Lt. Donoway adds that inmates in HU #5 "come out for recreation . . . handcuffed through a

security slot in their cell door and escorted by a Correctional Officer to the dayroom."  *Id.* at 3 ¶ 4.

---

[5] While Defendants draw a distinction between the two housing units, the Inmate Handbooks they attach as exhibits do not appear to do so.  For example, in the "Inmate Orientation Handbook" the housing units are described as follows:  "Housing Unit Four houses inmates on Disciplinary and Administrative Segregation. . . . Housing Unit Five houses Disciplinary and Administrative Segregation, Protective Custody, and general populate inmates."  ECF 21-3, at 11.  The "Segregation Unit Inmate Orientation Manual Procedures/Rules & Information" specifically references Housing Unit Four, but Defendants do not submit a different manual that applies to Housing Unit Five.  *Id.* at 39.  Thus, it would appear that the rules for "Recreation & Showers," *id.* at 52, apply to both housing units.

Once inside the dayroom, the handcuffs are removed, and the inmates are allowed to walk around the dayroom to use the phones and to shower. *Id.* Inmates on HU #5 are also not required to shower in restraints. *Id.* In both HU #4 and HU #5, "the dayrooms do not have tables for safety and security reasons" but, Lt. Donoway says, inmates "have tables and chairs in their cells." *Id.* Lt. Donoway also observes that HU #5 inmates "are able to exercise in their cells, doing calisthenics and other forms of exercise" and they are permitted to "use electronic tablets in their cell to communicate by text or email with people outside of the institution." *Id.* at ¶ 5. The tablets may also be used for legal research and to access reading material. *Id.* Smalls leased a tablet on July 22, 2022, and leased another tablet on January 18, 2023, he renewed the lease on April 18, 2023, and May 16 through August, 2023. ECF 21-3, 3-4 ¶ 10.

Inmates housed in both HU #4 and HU #5 are given "Recreation/Shower periods . . . for one hour and thirty minutes per day, three days per week." ECF 21-3, at 52. The schedule is, however, "subject to change depending on staffing needs of the Housing Unit." *Id.* Pursuant to OPS.145.0001.03.B, the DOC "shall provide special confinement inmates the opportunity to exercise and participate in recreational activities consistent with the security regulations and mandates of the inmates assigned correctional or detention facility." *See* DPSCS, Inmate Recreation Programs, Executive Directive OPS.145.0001.03.B, https://itcd.dpscs.state.md.us/pia/ShowFile?fileID=1425 (last viewed Sept. 10, 2024). It further provides that "[a]t a minimum, an inmate recreational program shall provide for . . . [a]n established schedule for the available activities for: . . . Special confinement housing inmates, to afford the opportunity to participate in activities consistent with requirements specific to status and the security regulations related to the special confinement housing assignment."

11

*Id.* at OPS.145.0001.05.B(4)(b).    According to Captain Derr and Lt. Kestler, no inmate is guaranteed outside recreation. ECF 21-3, at 3 ¶ 6; ECF 21-6, at 4 ¶ 11.

Lt. Kestler attests that the practice in place for providing out-of-cell recreation for inmates on HU #4 and HU #5 was to allow only small groups of inmates into the dayroom at one time. ECF 21-6, at 3 ¶ 7. Additionally, "staffing issues" often made it impossible to offer recreation five-days per week. *Id.* When staffing allowed for recreation, multiple groups would need to be "moved to the dayroom for recreation." *Id.* Lt. Kestler explains that "inmates from groups of up to 2 cells could be moved to the day[room] at one time for recreation" which required at least one correctional officer to move each inmate as well as other officers on the tier to provide added protection to the inmates and staff. *Id.* He adds:

> In HU4, there were three tiers, and could be as many as 258 inmates, sometimes more. Because of the time required to place handcuffs on inmates at each of their cells, walk them to the dayroom, then to remove the handcuffs in the dayroom, then to replace the handcuffs on them to retrieve the[m] from the dayroom, walk them back to their cells, and then to remove the handcuffs back at their cell, recreation movement requires considerable time and staffing for inmate and staff safety. As a result of staffing issues, there were not enough staff to perform these movements for all inmates every day, especially when it was necessary to perform other tier activities necessary for inmate well[-]being, such as security for medical visits and medication distributions on the tier, escorting inmates to medical visits or for transportation to court, and food distribution necessary to inmate well-being. Other tier activities, such as library deliveries for inmates, required staff availability.

*Id.* In HU #5, inmates in up to three cells of "compatible inmates" are taken to the dayroom for recreation "with 16 cells moved in each of the three shifts per day." ECF 21-8, at 3 ¶ 7. Lt. Donoway attests that "[b]ecause of staff limitations, while inmate Small was assigned to HU5, it was not possible to safely commit to moving all inmates to the dayroom for recreation, while also having to have staff available on the tier to provide security for activities important to inmate well[-]being medical visits, medication administration (pill call), food distribution, and urgent incidents,

or to escort inmates to the medical unit or for transportation to Court." *Id.* In other words, some inmates in HU #5 did not receive daily recreation outside their cell. *Id.*

## II.   STANDARD OF REVIEW

A motion to dismiss for failure to state a claim upon which relief may be granted is governed by Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted); *see also Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Put another way, "an unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

A court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer"

that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Commonwealth of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted).

When presented with a motion to dismiss or, in the alternative, a motion for summary judgement, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).[6] This Court is satisfied that the issues presented in this case have been fully briefed and shall construe Defendants' motion as one seeking summary judgment.

---

[6] Defendants' motion was clearly styled as a motion to dismiss or for summary judgment. ECF 21, at 1. A number of exhibits were filed in connection with that motion and Smalls was sent a conspicuous notice reflecting that a motion to dismiss or for summary judgment was filed in the case, and warning him that he must respond. ECF 25, at 1. Smalls responded to the motion with a lengthy memo addressing Defendants' summary judgment arguments and attaching exhibits of his own. *See* ECF 29-1, at 1–35; *see also* ECF 29-2 through ECF 29-4.

## III.    ANALYSIS

### A.    Exhaustion of Administrative Remedies

Defendants assert that Smalls has failed to properly exhaust administrative remedies with respect to any claims regarding access to jobs, education, visitation, religious services, law library access, or out-of-cell recreation while confined to HU #5. ECF 21-1, at 17–20. While Smalls briefly notes that assignment to segregation results in denial of access to jobs, out-of-cell education, visitation, religious services or law library access, *see* ECF 1, at 9, the Court reads his complaint as one challenging the lack of out-of-cell recreation and exercise while confined to segregation in HU #4 and HU #5. As such, whether Smalls exhausted administrative remedies for the other conditions he references in his complaint need not be addressed. However, the Court will address Defendants' assertion that Smalls did not exhaust administrative remedies for being denied out of cell recreation while confined to HU #5.[7]

If Smalls' claim has not been properly presented through the administrative remedy procedure it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for,

---

[7] Defendants concede that Smalls exhausted administrative remedies regarding out of cell recreation in HU #4. *See* ECF 21-1, at 17 ("These efforts fail to satisfy his requirement to exhaust his available administrative remedies before filing suit, other than as to outdoor rec for HU 4 inmates and the frequency of indoor rec for HU4 inmates.").

violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

.Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

In Maryland prisons, the Administrative Remedy Procedure is the administrative process that must be exhausted. Md. Code Regs. § 12.02.28.02(B)(1), (D) (2018). First, a prisoner must file an ARP with the warden within 30 days of the incident at issue. Md. Code Regs. § 12.02.28.05(D)(1) (requiring filing with the "managing official"); Md. Code Regs. § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible

16

for management of the correctional facility"); Md. Code Regs. § 12.02.28.09(B) (setting the 30-day deadline).  Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days.  Md. Code Regs. § 12.02.28.14(B)(5).  If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO").  Md. Code. Ann., Corr. Servs. §§ 10-206, 10-210; Md. Code Regs. § 12.07.01.05(B).  Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court.  *See* Md. Code Ann., Corr. Servs. § 10-210(a).

Smalls maintains that his assignment to HU #4 and HU #5 should be considered an aggregated term of "special confinement housing status."  ECF 29-1, at 17.  In his view, the assignment to HU #5 was "simply a continuation of his segregation in HU #4."  *Id.*  Defendants draw a distinction between the two assignments.  ECF 21-8, at 2 ¶ 4; ECF 21-6, at 1 ¶ 4.  As summarized above, Defendants note that administrative segregation pending *adjustment* is more restrictive than administrative segregation pending *transfer*.  In the former, housing assignment inmates are not permitted access to their personal property, but in the latter, inmates are permitted to access their personal property.  ECF 21-6, at 4 ¶ 14.  The two assignments differ for another reason as well: Smalls' confinement to HU #4 was of a shorter duration than his confinement to HU #5.  While confinement to restrictive, segregation housing for short periods of time may be unlikely to run afoul of the Constitution, longer terms of confinement under the same conditions may approach the level of cruel and unusual punishment or require due process protections before they may be lawfully imposed.  *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) ("routine discomfort" does not suffice to demonstrate the objective component of an Eighth Amendment claim); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir.

17

2006) (requiring conditions to be "so severe that defendants could be charged with fair warning their conduct was unconstitutional").

Conversely, to establish an Eighth Amendment claim, Smalls may assert that the challenged conditions demonstrate a substantial risk of serious harm in the future. Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011).

Assuming that Smalls' ARP regarding the lack of out-of-cell activities and exercise while confined to HU #4 provided Defendants with an adequate opportunity to address his claim that such conditions were deleterious to his physical health, this Court agrees with Smalls that his assignment to HU #5 was simply more of the same and should be covered by the ARP that he unquestionably did file. In other words, there is an adequate dispute of material fact to deny Defendants' request to dismiss the HU #5 claim for failure to exhaust administrative remedies. For this reason, the merits of his claims are addressed below.

### B.    Eleventh Amendment

Smalls states that he is suiting Defendants "individually and in [their] official capacit[ies]." ECF 1, at 3 ¶ 7. Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless the state consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* (citing *Fla. Dep't of Health v. Fla. Nursing Home Ass'n,* 450 U.S.

147 (1981) (*per curiam*). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original). The official capacity claims raised by Smalls are barred by the Eleventh Amendment and shall therefore be dismissed.

### C.    Fourteenth Amendment Claim

Smalls argues that he has a liberty interest implicated by the restrictions and deprivations he was subjected to because the restrictions imposed an "atypical and significant hardship" on him "in relation to the ordinary incidents of prison life." ECF 1, at 8. He further asserts that the Case Management team's failure to conduct "subsequent period reviews of his special confinement housing assignment" caused him to be confined to segregation longer without an opportunity to exercise beyond the confines of his cell. ECF 29-1, at 19. He states that regulations regarding those reviews "confer a procedural benefit" on him, thus creating a liberty interest that may not be removed without due process of law. *Id.* at 20. Smalls adds that requiring him to exercise in his cell while other inmates "even those in ECI housing unit #5, Protective Custody status, were afforded out of cell and outdoor exercise opportunities" violates the equal protection clause of the Fourteenth Amendment. *Id.* In his view, there is no legitimate governmental interest that justifies this difference in treatment. *Id.*

Prisoners have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 210 (2005). Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary

19

incidents of prison life" is a "necessarily . . . fact specific" comparative exercise. *Beverati v. Smith*, 120 F.3d 500, 502–03 (4th Cir. 1997) (quoting *Sandin*, 515 U.S. at 483–84); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)). "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." *Prieto v Clarke*, 780 F.3d 245, 250 (4th Cir. 2015). Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . harsh and atypical conditions" for Due Process protections to apply. *Id.* (citing *Wilkinson*, 545 U.S. at 224–25) (emphasis in original).

"[G]eneral population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015). Where, as in *Bevarati v. Smith*, conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population," no liberty interest exists in avoiding that segregation assignment. 120 F.3d 500, 503 (4th Cir. 1997).

The Supreme Court found a liberty interest implicated where inmates in Ohio were assigned to the Ohio State Penitentiary (OSP), a super-maximum security prison where almost all human contact was prohibited and communication between cells was forbidden. *Wilkinson*, 545 U.S. at 223. The Court noted that although the conditions alone were not enough to create a liberty

interest, when coupled with the indefinite duration of assignment[8] to the prison and the disqualification of an otherwise eligible inmate for parole consideration, the conditions "impose an atypical and significant hardship within the correctional context." *Id.* at 224. The three factors the Supreme Court said must be balanced to determine how much process is due are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 224–25 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, Defendants assert—and Smalls fails to dispute—that Smalls' placement on administrative segregation pending transfer was consensual. Defendants explain that Smalls was told that such an assignment would result in a quicker transfer out of ECI than if Smalls was placed in general population. Additionally, Smalls could not return to general population after his adjustment hearing because there were no beds available. Smalls' assignment to administrative segregation was therefore not indefinite and did not cause Smalls to be ineligible for a transfer, quite the opposite, in fact. As noted, Smalls could have requested to exit administrative segregation at any time, but there is no record that he did so. Thus, the procedural due process claim fails and Defendants are entitled to summary judgment in their favor.

Smalls' equal protection claim fairs no better. The equal protection clause generally requires the government to treat similarly situated people alike. *Cleburne v. Cleburne Living Ctr.*,

---

[8] The district court in *Wilkinson* noted that the length of an inmate's stay at the prison was a function of the procedures for review in place at the time. *See Austin v. Wilkinson*, 189 F. Supp. 2d 719, 740 (N.D. Ohio 2002). Inmates assigned to the prison could only progress through the various levels after reclassification reviews which were conducted annually and "even inmates with exemplary behavior rarely progress through OSP in less than two years." *Id.*

*Inc.*, 473 U.S. 432, 439 (1985).  Differential treatment may be alleged in the prisoner context by alleging "facts that [a plaintiff inmate] was treated differently from other similarly situated inmates." *King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016) (holding that an inmate's equal protection claim survived dismissal when it alleged two other inmates with medical conditions similar to the plaintiff's were not forced to undergo surgery, while the plaintiff was).  If the discrimination was based on a plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, the plaintiff must show that the discrimination did not bear a rational relationship to a legitimate government purpose.  *See Cleburne*, 473 U.S. at 440–42.  In other words, when no suspect class is involved, "the proper inquiry is whether the statute or regulation serves a legitimate state interest and whether the challenged classification is rationally related to it." *Williams v. Maynard*, Civ. No. ELH-13-2931, 2015 WL 1138263, at *8 (D. Md. Mar. 12, 2015) (citing *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir.1989)).

"[W]hile a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner's claims under the equal protection clause . . . must still be analyzed in light of the special security and management concerns in the prison system."[9] *Morrison v. Garraghty*, 239 F.3d 648, 655 (4th Cir. 2001) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)) ("There is nothing in the Constitution

---

[9] A prisoner's rights under the Constitution must not be inconsistent with his or her status as a prisoner.  *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984).  Even when strict scrutiny would otherwise be applicable to a given policy, because of the exigencies of prison administration, regulations must only be reasonably related to a legitimate penological interest.  *See Thornburgh v. Abbott*, 490 U.S. 401, 409–10 (1989).

which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.").

It is difficult to assess whether Smalls bases his equal protection claim on the purported difference between treatment of inmates on administrative segregation for purposes of protective custody and inmates on administrative segregation for some other purpose, or whether his complaint addresses the difference between those in segregation versus those in the general population. The result, however, is the same. The Court notes that there is an argument to be made that Smalls "is not similarly situated to those inmates" since they are technically in different housing environments. *Williams*, 2015 WL 1138263, at *8. Regardless, since either alleged discrimination is not based on membership in a suspect class, the Court must apply the rational basis test. *Cleburne*, 473 U.S. at 440–42. Though Smalls sees no such basis for the difference in treatment between those housed at his institution, that does not mean that no such reason exists. The record before the Court establishes that protective custody inmates are classified differently due to a plausible threat on their lives and their safety and often through no fault of their own. Further, Smalls' time in segregated housing was with his consent and designed to facilitate his transfer, a legitimate penological interest. As such, "the difference in treatment of inmates on segregation status is rationally related to the heightened security concerns of inmates housed on segregation and the consequent restriction in their movement." *Williams*, 2015 WL 1138263, at *8. The equal protection claim therefore fails.

### D. Eighth Amendment Claim

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

However, conditions which are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U.S. at 298–99. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly established pre-existing law. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of "a serious or significant physical or emotional injury resulting from the challenged conditions." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *De'Lonta*, 330 F.3d at 770).

Smalls' Eighth Amendment claim fails because he has not alleged any specific serious or significant physical or emotional injury resulting from his inability to leave his cell for outdoor recreation or exercise for the relatively short time period he identifies in his complaint. Absent such an injury, the conditions complained of do not run afoul of the Eighth Amendment's proscription against cruel and unusual punishment. Smalls argues that the risk to his health from exercise deprivation "was obvious." ECF 29-1, at 30. However, unlike cases where the deprivation of exercise over long term periods of segregation have been found to constitute a "serious deprivation" of a basic human need, there is no evidence that out-of-cell exercise was completely banned at ECI or that the relatively short duration at issue here rose to the requisite level to be actionable under the Eighth Amendment. *See LeMaire v. Maass*, 12 F.3d 1444, 1458 (9th Cir. 1993) (removal of outside exercise privileges did not constitute deliberate indifference where it was the plaintiff's own behavior that caused the revocation of the privilege imposed after a hearing). To be sure, the alleged depravations complained of by Smalls should not be trivialized. Smalls complains of losing opportunities to walk outdoors, to see the sky, and to feel the warmth of the sun on his face, perhaps unexceptional occurrences to the unincarcerated, but moments of peace understandably prized by those housed in jails and prisons. These depravations, however, at least as detailed by Smalls, fail to rise to the "extreme" level required to establish an Eighth Amendment claim. *De'Lonta*, 330 F.3d at 634.

Further, Defendants have explained that, at times, out-of-cell exercise could not be accommodated in instances where staffing shortages made it unsafe to allow inmates out of their cells. They further note that Smalls essentially agreed to these limits during a large portion of the time at issue by consenting to remain in segregation to facilitate his eventual transfer. As such, the record here does not show that these deprivations were exacted maliciously or for the intention of causing harm. For these reasons, Smalls' Eighth Amendment claim fails.

## IV.   CONCLUSION

For the reasons stated herein, and by separate Order which follows, Defendants' Motion to Dismiss or for Summary Judgment, construed as one seeking summary judgment, shall be granted and judgment shall be entered in their favor.


09/12/2024                                          _____/s/_____
Date                                               Brendan A. Hurson
                                                   United States District Judge